Michael **MEEROPOL** and Robert Meeropol, Plaintiffs,

v.

Louis **NIZER** and Doubleday & Company, Inc., Defendants.

No. 73 Civ. 2720.

United States District Court,
S. D. New York.

July 18, 1973.

Marshall Perlin, New York City, for plaintiffs.

Phillips, Nizer, Benjamin, Krim & Ballon by George Berger, New York City, for defendant Louis Nizer.

Satterlee & Stephens by Robert M. Callagy, New York City, for defendant Doubleday & Co., Inc.

## OPINION

TYLER, District Judge.

By order to show cause filed on June 21, 1973, plaintiffs have moved for an order restraining defendants *pendente lite* from infringing upon their claimed copyright in the letters of Julius and Ethel Rosenberg and from publishing, selling or disposing of copies of the book entitled *The Implosion Conspiracy*, written by the defendant Nizer and publish-

ed by the defendant Doubleday & Company, Inc. ("Doubleday"). 17 U.S.C. §§ 101 and 112; Rule 65, F.R.Civ.P. The motion for temporary injunctive relief was heard by the court on June 29, 1973. For reasons to be discussed hereinafter, the motion is denied in all respects.

Plaintiffs are the natural children of Julius and Ethel Rosenberg, who were executed in June, 1953 after their trial for treason in this court. Their complaint, filed on or about the same day as the present motion, sets out three separate claims: (1) for statutory copyright infringement pursuant to 17 U.S.C. § 101, with a prayer for permanent injunctive relief; (2) for damages of $1,000,000 for malicious defamation and invasion of plaintiffs' privacy through the publication of *The Implosion Conspiracy*; and (3) for money damages of $1,000,000 for common law infringement of and for injury to plaintiffs' property rights in unpublished and uncopyrighted works of their parents. Alleging diversity of citizenship, plaintiffs assert that this court has jurisdiction of the second and third claims pursuant to the provisions of 28 U.S.C. § 1331. As plaintiffs concede, however, their present motion is keyed entirely to the first or statutory copyright claim. In essence, it is charged that Nizer in his book quoted all or portions of some 29 letters of Ethel and Julius Rosenberg, which appeared in the book *Death House Letters of Ethel and Julius Rosenberg*, copyrighted in the United States in 1953 by the Jero Publishing Company, Inc. ("Jero").

Nizer and Doubleday contend, *inter alia*, that the challenged quotations constitute fair use of the material, that a significant part of the allegedly infringed material, if not all of it, is already in the public domain, that the plaintiffs are not the true copyright owners as asserted, and that they are barred by laches from bringing this action. Defendants also urge that a 1953 English edition of *Death House Letters* was offered for sale and sold in the United States, in violation of 17 U.S.C. §§ 10, 16, and 22.

*Death House Letters* was published on June 10, 1953 by Jero, which obtained a United States copyright, registration number 96637, Class A, on June 24, 1953. Apparently by express agreement with Jero, Dennis Dobson in November, 1953 reprinted *Letters* in London under the title *The Rosenberg Letters*. In the acknowledgement page of *The Implosion Conspiracy*, Mr. Nizer acknowledges that he used portions of the letters from this latter "Dobson edition".

*The Implosion Conspiracy* was first published in this country on February 9, 1973. To date, Doubleday has printed 100,000 hard cover copies, of which 85,000 have been sold to the trade. Thus, Doubleday has 15,000 copies remaining in inventory. Also, it appears that book clubs have sold and distributed about 40,000 copies. Pre-publication publicity was started as early as May, 1972, and Doubleday alleges without contradiction that it has expended $120,000 for advertising and incurred editorial, production and sales expenses totalling about $300,000.

*The Implosion Conspiracy* has enjoyed considerable popular success since its publication in February. In essence, it purports to be a factual but readable account of the trial and post-conviction legal proceedings in the celebrated *Rosenberg* case. A subordinate but nevertheless important theme of the author, as I understand his work, centers upon legal efforts of Emanuel Bloch and his total professional and emotional dedication to his clients, Julius and Ethel Rosenberg. Although the plaintiffs apparently claim otherwise, my reading of the book indicates that by and large it is a sympathetic and sensitive account of the Rosenbergs' personal, political and legal problems during the years of the trial and post-conviction appeals.

The parties agree that *Death House Letters* has been out of publication for almost twenty years. There is no evidence that the Dobson edition has been available since 1967. One copy of the latter edition is available in the New York Public Library, apparently because of a gift to that institution by the late

Emanuel Bloch. It is likely, however, that an occasional copy of *Death House Letters* might be found in book stores in New York City at the present time.

Turning to the use by defendants of all or portions of 29 letters of the Rosenbergs in *The Implosion Conspiracy*, it is to be noted that there has been considerable confusion in the parties' papers and briefs concerning the pages where the quotations appear. As I read the copy of *The Implosion Conspiracy* available to me,[1] the pages differ markedly from the pages submitted by plaintiffs and those by the defendants. Nevertheless, this confusion is one of detail only. There can be and are no differences in the actual quotations and where they appear by chapter in defendants' book. According to the pagination of my copy, the first quotation from a letter of the Rosenbergs appears in Chapter 37, at page 423. The other quoted references to the letters appear at the pages cited in the footnote below.[2] From a quantitative viewpoint, the quoted letters make up a very small portion of *The Implosion Conspiracy*.

It is important to trace carefully plaintiffs' allegations concerning the chain of title by which they lay claim to ownership of the original copyright issued by the United States Copyright Office for *Death House Letters*. As previously noted, plaintiffs are the sole issue and heirs of Julius and Ethel Rosenberg. They contend that when their parents composed and compiled their letters, they would deliver them to their lawyer, Emanuel Bloch, with instructions to him to turn the letters over to a corporation for publication and copyrighting, and to hold the same in trust for plaintiffs. As plaintiffs apparently concede, however, there is no written documentation of either delivery or instructions. In any event, Jero was organized as a New York corporation in

April, 1953, and copyright registration number 96637 issued to it on June 24, 1953.

Plaintiffs also allege that on August 19, 1953, an indenture of trust was drafted appointing five trustees, including Mr. Bloch. This trust indenture came to be known as "The Rosenberg Children's Trust Fund" (hereinafter "the Fund"). It is asserted that the Fund took title to all of the stock of Jero. As far as can be determined, there is no documentary evidence of this stock transfer before the court.

On January 30, 1954, Mr. Bloch died and was succeeded as one of the five trustees by another New York lawyer, Gloria Agrin Josephson. Three years later, on January 25, 1957, a certificate of dissolution of Jero was issued by the Secretary of State for the State of New York; the assets of the corporation, including the copyright, passed by operation of law to the sole stockholder, the Fund. Thereafter, according to the complaint, the Fund was terminated and its assets were assigned to plaintiffs. In a reply affidavit filed on the day of the hearing of this motion, plaintiffs' counsel submitted to the court a copy of a purported assignment from the Fund which was apparently dated on June 20, 1973 and was verified by the trustees who signed same on June 12 and 13 of this year.

In their moving papers, plaintiffs demand sweeping injunctive relief. Specifically, they seek an order enjoining the defendants from infringing the copyright of plaintiffs in any manner and from selling or disposing of any copies of *The Implosion Conspiracy*; directing that defendants deliver up for impounding all copies of the book under their control, all plates, molds and other printing materials, and all advertising and promotional materials which include any references to the letters of Ethel

---

1. Apparently, but not certainly, a book club edition.

2. Pp. 424, 428, 429, 430, 431, 433, 434, 443, 445, 446, 447, 450, 454, 455, 470, 471, 473, 474, 475, 507 and 508.

and Julius Rosenberg. At oral argument, however, plaintiffs' counsel took what he styled to be a more realistic approach and requested delivery only of the 15,000 inventory hard cover copies from the warehouse of Doubleday, and the enjoining of any possible paperback publication, or sale of any movie or television rights to the book by the defendants.[3]

■ Plaintiffs' counsel argued that once this court is satisfied that plaintiffs have made out a *prima facie* case that the statutory copyright exists and has been assigned to them, and further that Nizer and Doubleday have quoted portions of the letters, such evidence is sufficient to permit and, indeed, require the issuance of an injunction *pendente lite* as prayed. To the extent that plaintiffs' counsel contends that this court should ignore traditional equitable principles in determining whether or not to grant the drastic relief of a preliminary injunction, I cannot agree. It is true that §§ 101 and 112 of· the Copyright Act, for example, talk specifically about the power of a federal court to issue injunctions in copyright cases. It does not follow from this fact, however, that the court can grant such relief on the comparatively meager showing as advocated by plaintiffs. See, e. g., Rosemont Enterprises, Inc. v. Random House Inc., 366 F.2d 303 (2d Cir. 1966), cert. denied, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967). Generally speaking, the law is clear that a court in a copyright case must consider likelihood of success, irreparable harm, clean hands and other such classic equitable factors. *Ibid.* at page 306.

### The Issue of Plaintiffs' Ownership of the Statutory Copyright

■ As heretofore indicated, it can be said that the "chain of title" in the copyright is not as perfectly and formally established by documentation as one might wish. But at least for the purposes of this motion, plaintiffs, in my view, have made a sufficient offer of proof that they are the equitable, if not legal, owners of the statutory claim. Hence, I conclude that they have standing to make this motion.

### The Fair Use Defense

Nonetheless, upon evaluation of the entire record before the court, I conclude that the plaintiffs cannot meet their burden of establishing likelihood of success in this case. For this reason, and because a balancing of potential harm to plaintiffs and defendants tips against plaintiffs, I conclude that temporary injunctive relief must be denied in all respects.

■ A major reason for concluding that the plaintiffs have fallen short of showing likelihood of success is the fair use defense raised by the defendants. "Fair use is a privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner. . . ." Ball, Copyright and Literary Property, 260 (1944). As it has been put by the Court of Appeals for this circuit, "[c]ourts in passing upon particular claims of infringement must occasionally subordinate the copyright holder's interest in a maximum financial return to the greater public interest in the development of art, science and industry". Berlin v. E. C. Publications, Inc., 329 F.2d 541 (2d Cir. 1964). Whether or not this greater public interest is to be favored in a particular case turns to a large degree on the nature of the materials which are alleged to be copyrighted and infringed. Put differently, this issue is sometimes phrased as

---

3. In fairness to plaintiffs, they likely should be understood as also seeking to restrain any further advertisements of *The Implosion Conspiracy* which refer to or quote from any of the Rosenberg letters. Heretofore, the front cover flap has referred to "love letters between" the Rosenbergs. Plaintiffs also complain of three book reviews which refer to the letters, but there is no proof that defendants controlled the publication and substance of these reviews.

"whether their distribution would serve the public interest in the free dissemination of information and whether their preparation requires some use of prior materials dealing with the same subject matter." *Rosemont, supra,* 366 F.2d at page 307; see also, Time Incorporated v. Bernard Geis Associates, 293 F.Supp. 130 (S.D.N.Y.1968) (Wyatt, J.).

■ Consideration of the original volume entitled *Death House Letters* and more importantly the contents of *The Implosion Conspiracy,* suggests that this test is more than adequately met. In other words, the continuing interest in and importance of the celebrated Rosenberg case probably entitles the defendants' new book to invocation of the fair use doctrine. To illustrate the point, the "New York Times" recently published an article recognizing the 20th anniversary of the death of Julius and Ethel Rosenberg, adverting to the continuing public interest in their case. I further note that, ironically, this very court house is adjacent to Foley Square where earlier this month, and in June of other years, demonstrations took place in memory of the Rosenbergs and their execution.

■ Plainly, as defendants concede, *The Implosion Conspiracy* was designed and has been sold as a trade book for commercial gain. It is likely that the sales to date have already established this book as a successful "money-maker" if not a "best seller". Doubtless, as plaintiffs' counsel suggests, it may have continuing if not greater success in paperback editions. Still further, it is likely to be, if it has not already been, the subject of a contract for a movie or television screen play, or both. The book's commercial success, however, is no reason to conclude that it should be denied the benefits of the fair use doctrine. As I read *The Implosion Conspiracy,* the quotations were used with discretion and with demonstrable purpose to illustrate, from an historical and legal point of view, the post-conviction appeals and petitions for clemency which

were filed by and for Mr. and Mrs. Rosenberg. The relevant portions of the book almost certainly will provide reasonably valuable source material for future historians, biographers and social scientists. Indeed, the conceded fact that the letters have been out of publication here and abroad for almost twenty years, in my view, tends to enhance the likelihood that defendants can prove fair use of the letters in question. Thus, defendants are likely to prove that their book is a serious, full and readable account of what was a trial of great historical interest; that resort to quotations of certain of the Rosenbergs' letters is important to any serious book on their trial; and that there is little possibility of injury to the plaintiffs. Indeed, defendants may be able to show that their book has enhanced the value of plaintiffs' copyright. See Time Incorporated v. Bernard Geis Associates, *supra.*

### The Public Domain Claim

■ As a practical matter, this court's resolution of the fair use controversy effectively demolishes any likelihood of success in respect to the first stated claim of plaintiffs' complaint upon which this motion is squarely predicated. Nevertheless, it may be useful to point out other infirmities respecting plaintiffs' first stated count or claim in their complaint. The Rosenberg letters quoted in the Nizer book range in dates from October 28, 1950 to June 19, 1953. Of the 29 letters here involved, defendants have offered evidence suggesting that 5 to 7 thereof may have been in the public domain for many years. Defendants' documentary evidence also suggests that at least portions of four additional letters have been published in such journals as the "National Guardian" subsequent to June, 1953 when *Death House Letters* was copyrighted and first published. Consequently, defense counsel argue plausibly that with time to investigate, they may well be able to establish that more if not all of the letters are in the public domain. As a practical mat-

ter, indeed, a casual reader of the quotations from the letters appearing from Chapter 37 to the conclusion of defendants' book, might infer from their language that some of them were intended to be in the public domain. In sum, the present record, though incomplete, strongly suggests that plaintiffs may have serious difficulty in meeting the defense that all of their parents' letters are in the public domain and thus entitled to free usage by the defendants in *The Implosion Conspiracy*.

### Laches

Not surprisingly, defendants also argue that plaintiffs were guilty of laches in filing this suit. In brief, the argument is that there has been substantial public notice since the summer of 1972 that Mr. Nizer was to publish a book regarding the celebrated *Rosenberg* case. In any event, the argument continues, plaintiffs should have known shortly after February 9 of this year that this widely publicized book refers to some of the Rosenbergs' letters. Thus, conclude defendants, plaintiffs were dilatory in commencing this suit as late as June 21, 1973. To this, plaintiffs' counsel rejoins that he only was retained in April, 1973, and normal preparations, investigations and the like kept him busy until June 21 preparing his complaint and the motion papers for plaintiffs. For present purposes at least, I am inclined to think that plaintiffs should prevail against the asserted equitable defense of laches.

### Permission to Use

██ The record on this motion presents another factual issue which is rather close and pertinent to the question of whether or not preliminary injunctive relief should be granted. Mr. Nizer asserts in his affidavit opposing this motion that in the summer of 1972 he sought and obtained a meeting with Gloria Agrin Josephson who, as indicated, was and is the late Mr. Bloch's successor as a trustee of the Fund. According to Nizer, he and Ms. Josephson met in 1972 and during the course of the conference, he asked for and obtained from her, permission to refer to and quote some of the *Death House Letters*. Indeed, as Mr. Nizer recalls it, Ms. Josephson offered to loan to him for this purpose her copy of *Death House Letters*.

In reply, Ms. Josephson has submitted an affidavit denying that she gave any such permission, although she does admit the meeting. Further, however, Ms. Josephson appears to indicate that she suggested that Mr. Nizer would have no difficulty in obtaining permission to use and quote from the letters.

Though far from clear, the present situation suggests that there may have been an understanding, the nature of which reasonably and properly indicated to Mr. Nizer that he did have the approval of a representative of the plaintiffs to refer to and quote from the letters in a reasonable and pertinent matter. At a plenary trial, in other words, it is possible that defendants could prove such an understanding and agreement, particularly in light of the conceded fact that the letters have been out of print to all practical extent and purposes for so many years.

### Balancing of the Possibilities of Injury, Existing and Potential

██ Obviously, in deciding whether a preliminary injunction should issue, it is necessary to consider the question of irreparable harm to the parties. See Rosemont Enterprises Inc. v. Random House, Inc., *supra*, 366 F.2d at pages 310–311. Plaintiffs do not claim that they have been deriving any material benefits from the copyrighted book *Death House Letters*. Indeed, one could infer from the passage of so many years that the plaintiffs have not contemplated any possibilities of gain from such rights as they have in the letters or that book. Moreover, there is absolutely no suggestion, let alone proof, that the publication of *The Implosion Conspiracy* has

lessened the value of the letters of Julius and Ethel Rosenberg. Practically speaking, the only realistic inferences are to the contrary—i. e. that the defendants' book probably has been the only significant event that might enhance their value.

Finally, plaintiffs do not dispute the substantial investment that the defendants have in their book. There is no suggestion, either, that the defendants are monetarily irresponsible or unable to satisfy any judgment for money damages that plaintiffs might possibly obtain in this case. Accordingly, it is concluded that the balancing of potential and existing harm favors defendants and not plaintiffs. See Life Music, Inc. v. Wonderland Music Co., 241 F.Supp. 653 (S.D.N.Y.1965); Pocketbooks, Inc. v. Dell Publishing, 49 Misc.2d 252, 267 N.Y.S.2d 269 (Sup.Ct.N.Y.Co.1966); Rosemont Enterprises Inc. v. Random House Inc., *supra.*

*Defendants' Motion to Dismiss Plaintiffs' First Stated Claim*

▮▮▮▮ Earlier in this memorandum it was indicated that plaintiffs are unlikely to prove their first stated claim of statutory copyright infringement by reason of the appropriate defense of fair use. In their papers opposing plaintiffs' motion, defendants have suggested and indeed urged that the record is sufficient for this court to dismiss the first claim on this ground. But "fair use" would seem to be a function of all of the circumstances, and plaintiffs should have the opportunity to rebut the presumption that arises from the nature of the materials and the circumstances described herein. It is not altogether clear that letters stand on the same footing as "historical facts", which are the product of research and in turn form the basis for subsequent works. See *Rosemont, supra.* And the relatively slight quantitative significance of the quotations perhaps overstates their qualitative impact. Defendant Nizer, moreover, is a lawyer; he knew about *Death House Letters* and its copyright, yet

made only one somewhat ambiguous attempt to obtain permission to cite the letters in his book. Finally, although this is not stressed by the parties, it appears that defendant Doubleday published another book, *Invitation to an Inquest.* In the original version of that book, excerpts of certain of the Rosenberg letters appeared; but there is evidence that Doubleday would not permit such use unless written consent was obtained. Thus, it would seem that both defendants were well aware of the potential copyright infringement represented by quotations of the letters in *The Implosion Conspiracy.* Accordingly, defendants' motion to dismiss the first claim is denied without prejudice.

To summarize, then, the plaintiffs' motion for temporary injunctive relief is denied in all respects; further, the defendants' cross motion to dismiss the first stated claim in the complaint is denied without prejudice to renewal thereof upon an expanded record.

It is so ordered.