Michael **MEEROPOL** and Robert Meeropol, Plaintiffs-Appellants,

v.

Louis **NIZER**, Doubleday & Co., Inc. and Fawcett Publications, Inc., Defendants-Appellees.

No. 886, Docket 76–7434.

United States Court of Appeals, Second Circuit.

Argued May 19, 1977.

Decided July 28, 1977.

Marshall Perlin, New York City (Kristin Booth Glen, New York City, Samuel Gruber, Stamford, Conn., and Max R. Millman, Philadelphia, Pa., of counsel), for plaintiffs-appellants.

Robert M. Callagy, New York City (Satterlee & Stephens, James Rittinger, New York City, of counsel), for defendants-appellees Doubleday & Co., Inc. and Fawcett Publications, Inc.

George Berger, New York City (Phillips, Nizer, Benjamin, Krim & Ballon, Martin Stein, New York City, of counsel), for defendant-appellee Louis Nizer.

Before MOORE, SMITH and MULLIGAN, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Michael and Robert Meeropol appeal from dismissal on summary judgment in the United States District Court for the Southern District of New York, Harold R. Tyler, Jr. and Lee P. Gagliardi, *Judges*, of a three-count complaint alleging infringement of statutory copyright (Count I), invasion of privacy and defamation (Count II), and infringement of common law copyright (Count III). Jurisdiction is based on 28 U.S.C. §§ 1338, 1331 and 1332.

Appellants are the natural children of Julius and Ethel Rosenberg. Their parents were executed in June 1953 after conviction for conspiring to transmit information relating to the national defense to the Soviet Union. Appellees Louis Nizer ("Nizer"),

Doubleday & Co., Inc. ("Doubleday") and Fawcett Publications, Inc. ("Fawcett") are the author and publishers respectively of an account of the events surrounding the Rosenberg trial entitled *The Implosion Conspiracy*, published in 1973. Plaintiffs-appellants alleged that Nizer incorporated in his book substantial portions of copyrighted letters written by Ethel and Julius Rosenberg without authorization and that this use constituted infringement of their statutory and common-law copyright. Nizer's allegedly inaccurate, misleading and fictionalized account of the events surrounding the trial, it is claimed, constitutes defamation and invasion of privacy as to appellants.

In June 1973 appellants filed a complaint in the Southern District of New York seeking injunctive relief and damages for copyright infringement, defamation, and invasion of privacy from defendants Nizer and Doubleday. Judge Tyler held that the Meeropols had not established sufficient likelihood of success on the merits and denied the request for injunctive relief. At the same time he denied defendants' cross-motion to dismiss the complaint. *Meeropol v. Nizer*, 361 F.Supp. 1063 (S.D.N.Y.1973). Judge Tyler's decision rested in part on the possible availability to defendants of the "fair use" defense which might require the subordination of copyright claims to the greater public interest in the dissemination of knowledge. He refused to dismiss the complaint in order to give plaintiffs an opportunity to establish the facts, especially since it is not altogether clear whether letters stand on the same footing as "historical facts" in relation to the "fair use" doctrine. 361 F.Supp. 1067, 1070.

Following discovery proceedings and pre-trial motions, the appellees, defendants below in the Southern District action, moved in January 1974 for partial summary judgment on the defamation and privacy claims of Count II. This motion was granted July 31, 1974 by Judge Tyler. 381 F.Supp. 29

(S.D.N.Y.1974). In the meantime the Meeropols had commenced a similar action against Fawcett, publishers of a paperback edition of the Nizer book, in the District Court for the District of Connecticut. Fawcett moved to stay the Connecticut action and sought leave to intervene in the New York action. These motions were granted in an unreported opinion by Judge Tyler, affirmed by this court October 12, 1974. *Meeropol v. Nizer*, 505 F.2d 232 (2d Cir. 1974).[1]

On January 30, 1975 defendants moved to dismiss the remaining copyright counts, I and III, of the complaint. This motion was granted by Judge Gagliardi to whom the case had been reassigned following Judge Tyler's resignation from the bench. The present appeal is from the final judgment entered July 23, 1976 dismissing all counts of the complaint against all of the defendants, based on Judge Tyler's grant of partial summary judgment dismissing Count II dated July 31, 1974 and on an opinion and order of Judge Gagliardi dated July 20, 1976 dismissing Counts I and III of the original complaint and all three counts of the supplemental complaint. *Meeropol v. Nizer*, 417 F.Supp. 1201 (S.D.N.Y.1977). We affirm the dismissal of Counts II and III, and reverse and remand for further proceedings on Count I.

### The Defamation Claim

Plaintiffs sought one million dollars in damages for defamation and invasion of privacy in Count II of their complaint. They alleged that the juxtaposition in Nizer's book of excerpts of the private letters of their parents with "false, fictitious and distorted" statements was designed to deceive the reader and impress the public with the authenticity of Nizer's account in order to embarrass, humiliate, and ridicule plaintiffs and their parents.

In dismissing the defamation count the court below applied the standards set forth in *Gertz v. Welch*, 418 U.S. 323, 94 S.Ct.

---

1. In affirming the district court order granting a stay and Fawcett's motion for leave to intervene, we conditioned affirmance on the preservation of plaintiffs-appellants' right to jury trial as to defendant Fawcett. 505 F.2d 238.

2997, 41 L.Ed.2d 789 (1974), *Rosenbloom v. Metromedia*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), and *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). It held that because they were the sons of the Rosenbergs, Michael and Robert were "public figures" and that in order to recover plaintiffs would have to establish that defendants' book was published with reckless disregard for the truth. The court analyzed the passages in the book alleged to be libelous. It found that

> The record as a whole, thus, establishes that there was no knowledge of falsity (if indeed, there is a falsity), no serious doubt concerning the truth of any statement in the article [sic] and certainly no reckless disregard of whether statements in the book were false.

> To the extent that *The Implosion Conspiracy* contains minor fictionalization or approximations of conversations that may have taken place between plaintiffs and their parents, these cannot be considered defamatory. Such techniques do not rise to the constitutional level of a clear and convincing showing of reckless disregard. As in *Miller v. News Syndicate*, 445 F.2d 356 (2d Cir. 1971), any "deviations from or embellishments upon" the information obtained from the primary sources relied upon were minuscule and can be attributed to the leeway afforded an author who attempts to recount and popularize an historic event.

381 F.Supp. 35.

We have carefully reviewed the portions of *The Implosion Conspiracy* which appellants have cited as defamatory. We agree with the district court that no passages are defamatory on their face. Of 77 pages cited, only 29 passages refer to appellants. Most of these passages contain innocuous references to the Rosenberg children and their interaction with their parents. While some of the accounts are undoubtedly somewhat fictionalized and inaccurate, almost none would be viewed as defamatory by

any reasonable reader. Appellants were asked to specify in what respect the passages were false in answer to interrogatories from appellees. Their answers consisted in general allegations that the account misrepresented historical facts and cast their parents and their supporters in an unfavorable light. Three charges of falsity relating specifically to appellants are however included in the answers to the interrogatories.

On page 400 of his book Nizer writes, "Bloch [the Rosenberg's attorney] had placed Michael, nine years old, and Robert, five years old, in a Bronx shelter home." Appellants counter that they were never placed in a shelter by their parents' attorney. In fact the children were, at one point, transferred to a foster home because their paternal grandparents were ill and unable to care for them.[2]

Nizer's account of the evening of the Rosenberg's execution contains the following account on page 483:

> On the evening of the execution, the kind woman with whom the children were staying sought to shield Michael from the shock. There was a baseball game between the New York Yankees and Detroit Tigers on television. She lured him into watching it. She had underestimated the overriding interest in the case. Suddenly, there was a fearful scream like those that ejected him from his nightmares. A bulletin had flashed across the screen: "President Eisenhower has turned down Ethel and Julius' final appeal. They must die tonight."

> She rushed into the room and found Michael curled up in a corner of the big leather chair in a fetal position, whimpering. With difficulty, she lifted him in her arms and carried him to bed, where she held him tenderly during the sleepless night.

This constitutes an untrue description according to appellants because "Plaintiff sat

2. *We Are Your Sons*, Robert and Michael Meeropol, (1975), p. 126.

quietly with his hands folded looking down. Plaintiff did not cry."[3]

Passages at pages 23, 242 and 366–67 of Nizer's book refer to the neurotic behavior of Michael and Robert as children. The accuracy of these descriptions has been documented in appellants' own book and in other sources.[4] The allegations that Nizer distorted the trial record, deleted relevant parts of letters by their parents which were quoted in the book, or cast their parents' actions in a false light are irrelevant to an action for defamation brought by Michael and Robert Meeropol.[5] The literary and historical worth and accuracy of Nizer's account are not in issue before us, however important they may be to appellants. We may consider only the claims of appellants themselves and the rules of law applicable to them.

 We agree with the court below that the Rosenberg sons are public figures. "[A]n individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts" and "such persons assume special prominence in the resolution of public questions." *Gertz v. Welch, supra,* 418 U.S. 351, 94 S.Ct. 3013. In the course of extensive public debate revolving about the Rosenberg trial appellants were cast into the limelight and became "public figures" under the *Gertz* standards.[6] Even if some of the statements quoted above from *The Implosion Conspiracy* were found to be defamatory, appellants, as public figures, could not prevail absent a showing of reckless disregard of the truth or malice. *New York Times v. Sullivan, supra.* The record here is devoid of either recklessness or malice and in the course of extensive discovery proceedings appellants failed to cite a single specific incidence in which Nizer had reck-

lessly or maliciously disregarded the truth in statements pertaining directly to them. We find no error in the trial court's denial of motions for further discovery on the issue of malice. *The Implosion Conspiracy* is lacking in material obviously false as to appellants. In the absence of such material their defamation claim must fall.

### The Privacy Claim

 Judge Tyler held that the activities of the Rosenberg children portrayed in *The Implosion Conspiracy* were matters properly within the "orbit of public interest and scrutiny." For this reason he held that statements in the book, even if they constituted an invasion of privacy, were constitutionally protected. 381 F.Supp. 37. The same standards of constitutional protection apply to an invasion of privacy as to libel actions. It is immaterial to appellants' privacy claim whether Nizer's book is viewed as an historical or a fictional work. In either case the *New York Times v. Sullivan* test on reckless disregard of the truth is applicable since we are dealing with public figures. *Time, Inc. v. Hill,* 385 U.S. 374, 390, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); *Spahn v. Messner,* 21 N.Y.2d 124, 286 N.Y. S.2d 832, 834 (1967).

The guarantees for speech and press are not the preserve of political expression or comment upon public affairs, essential as those are to healthy government. One need only pick up any newspaper or magazine to comprehend the vast range of published matter which exposes persons to public view, both private citizens and public officials. Exposure of the self to others in varying degrees is a concomitant of life in a civilized community. The risk of this exposure is an essential incident of life in a society

---

**3.** Plaintiffs' answer to interrogatory # 38, p. 9.

**4.** *We Are Your Sons, supra,* pp. 118, 120; *The Betrayers,* Jonathan Root, pp. 78, 80, 108, 229; *The Judgment of Julius and Ethel Rosenberg,* John Wexley, pp. 124, 130, 142 and 198; Appendix at 126–129.

**5.** Prosser, *Law of Torts* § 111, at 745 (4th ed.).

**6.** The decision whether or not a plaintiff in a defamation suit is a public figure is one properly made by the court in the first instance. *Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 15 L.Ed.2d 597 (1965); *Hotchner v. Castillo-Puche,* 404 F.Supp. 1041, 1045 (S.D.N.Y. 1975), *rev'd on other grounds,* 551 F.2d 910 (2d Cir. 1977), *petition for cert. filed,* 45 U.S.L.W. 3841 (June 20, 1977).

which places a primary value on freedom of speech and of press. "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill v Alabama*, 310 U.S. 88, 102, 60 S.Ct. 736, 84 L.Ed. 1093, "No suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and importance of the ideas seeking expression." *Bridges v. California*, 314 U.S. 252, 269, 62 S.Ct. 190, 86 L.Ed. 192 . . . "The line between the informing and the entertaining is too elusive for the protection of . . . [freedom of the press]." *Winters v. New York*, 333 U.S. 507, 510, 68 S.Ct. 665, 92 L.Ed. 840. Erroneous statement is no less inevitable in such a case than in the case of comment upon public affairs, and in both, if innocent or merely negligent, " . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive'. . ." *New York Times Co. v. Sullivan, supra*, 376 U.S. at 271–272, 84 S.Ct. 710. As James Madison said, "Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press." 4 Elliot's Debates on the Federal Constitution 571 (1876 ed.).

*Time, Inc. v. Hill*, 385 U.S. 388–89, 87 S.Ct. 542.

■ Invasion of privacy, absent extreme, physical invasion of privacy, relates to a purely statutory right in New York and is governed by §§ 50–51 of the New York Civil Rights Law,[7] the same statute which was before the Court in *Time, Inc. v. Hill, supra*. *Koussevitzky v. Allen, Towne & Heath, Inc.*, 188 Misc. 479, 68 N.Y.S.2d 779, 781, *aff'd* 272 App.Div. 759, 69 N.Y.S.2d 432 (1974). A prerequisite for recovery under § 51 is that plaintiff's "name, portrait, or picture" is used by defendant. *Notre Dame v. Twentieth Century Fox*, 22 A.D.2d 452, 256 N.Y.S.2d 301, 304, *aff'd* 15 N.Y.2d 940, 259 N.Y.S.2d 832 (1965). Unauthorized biographical works are not subject to suits under § 51 since they are viewed as legitimate dissemination of information on subjects of general interest. *Koussevitzky, supra*, 188 Misc. 479, 68 N.Y.S.2d 783–84; *Sidis v. F–R Pub. Corp.*, 113 F.2d 806, 809 (2d Cir.), *cert. denied*, 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462 (1940). *Sidis* involved a claim for invasion of privacy by a former child prodigy who had subsequently cloaked himself in obscurity. Although this court found that an account in the *New Yorker* about plaintiff was "merciless in its dissection of intimate details" of plaintiff's personal life, *id.* at 807, it rejected his claim under §§ 50 and 51 of the New York Civil Rights Law. Judge Clark, writing for the court, said that "Regrettably or not the misfortunes and frailties of neighbors and 'public figures' are subjects of considerable interest and discussion to the rest of the population. And when such are the mores of the community, it would be unwise for a court to bar their expression in the newspapers, books, and magazines of the day." *Id.* at 809.

■ All references to appellants in *The Implosion Conspiracy* are to Michael and Robert Rosenberg, not to Michael and Robert Meeropol. After their parents' death, Robert and Michael were adopted by the Meeropol family and except among a few

---

7. Sections 50 and 51 of the New York Civil Rights Law, 8 McKinney's Consol. Laws of N.Y. (1976) provide in relevant part

§ 50. Right of privacy
A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person . . . is guilty of a misdemeanor.

§ 51. Action for injunction and for damages
Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof. . . .

intimate friends, were known exclusively under the name of their adoptive parents. Their true identity was concealed even from most of their closest friends and associates until sometime after the Nizer book was published. Nothing contained in the Nizer book linked the Rosenbergs to the Meeropols. Thus, even if we assumed *arguendo* that Robert and Michael Meeropol were not "public figures" at the time this book was published, the book could not have defamed them or invaded their privacy since the book never referred to them by the Meeropol name or in any way linked the Rosenbergs to the Meeropols. It was appellants' disclosure of their true identity following publication of *The Implosion Conspiracy* which made the accounts in the book referable to Robert and Michael Meeropol. This disclosure cannot be attributed to appellees-defendants.

The material published in *The Implosion Conspiracy* is beyond the reach of §§ 50–51 of the New York Civil Rights Law and appellants' privacy claim was properly dismissed.

### *Fair Use Defense*

The court below held that "as a matter of law the use of [the] copyrighted material under the circumstances here is covered by the fair use doctrine, and thus summary judgment is appropriate as to all defendants." Furthermore, as to defendants Nizer and Doubleday the court found on the basis of the record and its examination of the *Death House Letters* and *The Implosion Conspiracy* that the use of the copyrighted Rosenberg letters in *The Implosion Conspiracy* constituted fair use as a matter of fact.

Fair use has been defined as:

a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner by the copyright.[8]

The doctrine offers a means of balancing the exclusive right of a copyright holder with the public's interest in dissemination of information affecting areas of universal concern, such as art, science, history, or industry. *Wainwright Securities Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91 (2d Cir. 1977). Its application has been termed among "the most troublesome in the whole law of copyright." 2 M. Nimmer *Copyright*, § 145 (1976), *quoting Dellar v. Samuel Goldwyn, Inc.*, 104 F.2d 661 (2d Cir. 1939). Justice Story in an early case addressing the fair use defense which involved alleged infringement of copyrighted letters of George Washington remarked that "Patents and copyrights approach nearer than any other class of cases belonging to forensic discussions, to what may be called the metaphysics of the law, where the distinctions are, or at least may be very subtle and refined, and sometimes, almost evanescent." *Folsom v. Marsh,* 9 F.Cas. 342, 344 (C.C.D. Mass.1841) (No. 4901). It is thus not surprising that the application of the fair use doctrine to the facts of this case confronts us with difficult and complex issues.

The line which must be drawn between fair use and copyright infringement depends on an examination of the facts in each case. It cannot be determined by resort to any arbitrary rules or fixed criteria. *Tennessee Fabricating Co. v. Moultrie Mfg. Co.,* 421 F.2d 279 (5th Cir.), *cert. denied,* 398 U.S. 928, 90 S.Ct. 1819, 26 L.Ed.2d 91 (1970), *citing John Schulman,* 53 Iowa L.Rev. 832 (1968) (other cites omitted). The Copyright Revision Act of October 19, 1976, P.L. 94–553, 90 Stat. 2541 (1976), which will take effect January 1, 1978, codifies the fair use doctrine in § 107. Section 107 is intended to restate the existing judicial doctrine of fair use, not to change, narrow or enlarge it. Copyrights Act, H.R. Rep.No. 94–1476, *reprinted in* 1976 U.S. Code Cong. & Admin.News, 5659, 5680. The text of 17 U.S.C. § 107 is as follows:

Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction

8. *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303, 306 (2d Cir. 1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967), *quoting* Ball, *The Law of Copyright and Literary Property,* 260 (1944).

in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The court below applied these criteria in order to determine whether the fair use defense was available to defendants. It held that to succeed on a summary judgment motion defendants had to show that no genuine issues of fact "had to be tried." 417 F.Supp. 1206, 1208. It found that factual issues raised by plaintiffs were either not in dispute or were such that even if resolved in plaintiffs' favor they would not affect the fair use question. 417 F.Supp. 1208, 1210. We must disagree. We think fair use not established as a matter of law and that genuine issues of fact exist precluding the grant of summary judgment for defendants.

Relying on *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303 (2d Cir. 1966), the court held that the definition of an historical work for the purpose of the fair use doctrine is a very broad one, and that *The Implosion Conspiracy* fell within this definition. 417 F.Supp. 1209. *Rosemont* involved the use of copyrighted material about Howard Hughes published in *Look Magazine* in a subsequent biography of Hughes. The court there found that this use fell within the fair use doctrine. Biographers, it held, customarily refer to and utilize earlier works dealing with the subject of the biography and occasionally quote directly from their works. The fact that the Hughes biography was perhaps not a profound work did not deprive it of the fair use privilege as a book of historical interest. Whether or not an author also has a commercial motive in publishing the work was held irrelevant to the availability of the fair use defense. In *Rosemont,* however, only two direct quotations had been copied. *The Implosion Conspiracy* includes verbatim portions of 28 copyrighted letters. *Rosemont* involved the use of copyrighted statements concerning the actions of a biographical subject, not as here the use of verbatim letters written by the subject. In addition, it appears that the fair use defense was upheld in *Rosemont* at least in part because the court found that the plaintiff there was acting in bad faith seeking to prevent the publication of a legitimate biography of Howard Hughes.[9]

We agree that the mere fact that Nizer's book might be termed a popularized account of the Rosenberg trial lacking substantial scholarship and published for commercial gain, does not, standing alone, deprive Nizer or his publishers of the fair use defense. For a determination whether the fair use defense is applicable on the facts of this case, however, it is relevant whether or not the Rosenberg letters were used primarily for scholarly, historical reasons, or predominantly for commercial exploitation. The purpose and character of the use of the copyrighted material, the nature of the copyrighted work, and amount and substantiality of the work used, and its effect upon the potential market for the copyrighted material are factors which must be evaluated in concert. *Williams & Wilkins Co. v. United States,* 487 F.2d 1345, 1353, 203 Ct.Cl. 74 (1973), *aff'd by an equally divided court,* 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264 (1975) (per curiam). If the effect on the market by an infringing work is minimal, for example, far greater use may be privileged than

---

9. Concurring opinion of Judges Lumbard and Hays, 366 F.2d at 311.

where the market value of the copyrighted material is substantially decreased. Similarly, where use is made of underlying historical facts such use will be entitled to complete freedom but it is otherwise if there is verbatim copying of original, copyrighted material. "The fair use privilege is based on the concept of reasonableness and extensive verbatim copying or paraphrasing of material set down by another cannot satisfy that standard." *Rosemont Enterprises, Inc. v. Random House, Inc., supra,* 366 F.2d 310.

■ A key issue in fair use cases is whether the defendant's work tends to diminish or prejudice the potential sale of plaintiff's work. *Marvin Worth Productions v. Superior Films Corp.,* 319 F.Supp. 1269, 1274 (S.D.N.Y.1970); 2 M. Nimmer *Copyright,* § 145. The fact that the Rosenberg letters have been out of print for 20 years does not necessarily mean that they have no future market which can be injured. 2 M. Nimmer, *supra* at 649. The market for republication or for sale of motion picture rights might be affected by the infringing work. Here the court concluded that plaintiffs might be able to prove damages at trial but held this fact irrelevant. 417 F.Supp. 1210, 1215. The court also conceded that the qualitative impact of the copied material presented an issue as to which reasonable men might disagree even though the basic quantity of the infringement and the surrounding circumstances were undisputed. The court admitted that the ultimate resolution of these issues turned on the subjective judgment of the trier of fact. *Id.* at 1211. The court then proceeded to hold that the use of the letters in *The Implosion Conspiracy* was entitled to the fair use defense because it found the use of copyrighted letters by Nizer to be insubstantial. "The letters . . ." it held, "do not in any sense form a major part of defendants' work." *Id.* at 1213. We disagree.

■ It was error to hold that as a matter of law the fair use defense was available to defendants when the purpose for which the letters were included in the book and the effect of the use of the copyrighted letters on their future market were in dispute. The determination whether the use under these circumstances was substantial should have been made by the trier of fact in the light of all relevant facts. In holding that the use here was insubstantial, the court distinguished *Folsom v. Marsh, supra.* 9 F.Cas. 342, the only American case which has addressed the verbatim copying of copyrighted historical letters. Justice Story denied the fair use defense in *Folsom* because he found that George Washington's letters formed a substantial part of the allegedly infringing biography. He held that there could be no fair use of letters in an historical work "if the value of the original is sensibly diminished or the labors of the original author are substantially appropriated". "[Letters] may be inserted as a sort of distinct and mosaic work, into the general texture of the second work, and constitute the peculiar excellence thereof, and then it may be a clear piracy." *Id.* at 348. Justice Story is quite explicit about the policy underlying copyright protection for personal letters.

> What descendant or representative of the deceased author would undertake to publish at his own risk and expense, any such papers; and what editor would be willing to employ his own learning and judgment, and researches, in illustrating such work, if the moment they were successful, and possessed the substantial patronage of the public, a rival bookmaker might republish them, either in the same, or in a cheaper form, and thus either share with him, or take from him the whole profits.

*Id.* at 347.[10]

■ Defendants-appellees reprinted verbatim portions of 28 copyrighted letters,

10. See also, *Zacchini v. Scripps Howard Broadcasting Co.,* —— U.S. ——, ——, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977).

a total of 1957 words.[11] Although these letters represent less than one percent of *The Implosion Conspiracy,* the letters were prominently featured in promotional material for the book.[12] The fact that the letters were quoted out of chronological order, many undated, without indication of elisions or other editorial modifications is relevant to a determination of the purpose for their use and the necessity for verbatim quotations for the sake of historical accuracy.

 The availability of the fair use defense depends on all the circumstances surrounding the use of copyrighted material. This court has repeatedly stressed

> that "on a motion for summary judgment the court cannot try issues of fact; . . . it must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, . . . with the burden on the moving party to demonstrate the absence of any material factual issue genuinely in dispute . . . ."

*Frey Ready-Mixed Concrete v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 555 (2d Cir. May 6, 1977), *citing Heyman v. Commerce & Industry Insurance Co.,* 524 F.2d 1317, 1319–20 (2d Cir. 1975).[13] See also *Time, Inc. v. Bernard Geis Associates,* 293 F.Supp. 130 (S.D.N.Y.1968); *Berlin v. E.C. Publications, Inc.,* 329 F.2d 541 (2d Cir.), *cert. denied,* 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964). Summary judgment on the issue of fair use was granted in *Time, Inc. v. Bernard Geis* and in the *Berlin* case, but there were no relevant facts in dispute in either case. In *Berlin* it was clear that the infringing parody had neither the effect nor the intent of fulfilling the demand for the original work, and that no greater amount had been appropriated than necessary. In *Time, Inc. v. Bernard Geis* it was likewise undisputed that there was little or no injury to the copyright owner, and the court found that the infringing book was not bought because it contained a copyrighted photograph of the Kennedy assassination at issue in that case. 293 F.2d 146. In the case before us it has been conceded that plaintiffs might have incurred damages, and there is a dispute between the parties as to the purpose of and necessity for including verbatim letters in the book. For the sole purpose of the summary judgment motion all parties conceded that appellants held a valid copyright for the *Death House Letters.* This issue, as well as the fair use question, remains in dispute however.

 Appellants are entitled to an opportunity to introduce evidence on the issues of the purpose of the use and of damages. Whether or not there has been substantial use which would deprive appellees of the fair use defense is a decision which must be made by the trier of fact after all the evidence has been introduced. We hold that it was error to uphold the fair use defense as a matter of law as to all defendants. As to Nizer and Doubleday it also was error to uphold the defense in the alternative on factual findings, in the absence of evidence on the question of damages. We therefore reverse the grant of summary judgment as to all defendants and remand so that appellants can be given the opportunity to introduce evidence on all aspects of the fair use defense.[14]

---

**11.** In addition, defendants copied two letters, containing 1058 words, copyrighted in the British edition of the *Death House Letters.* 417 F.Supp. 1206, n. 3.

**12.** See Appendix at 255.

**13.** See *Gladstone v. Fireman's Fund Insurance Co.,* 536 F.2d 1403, 1406 (2d Cir. 1976); *United States v. Bosurgi,* 530 F.2d 1105, 1110 (2d Cir. 1976); *National Life Insurance Co. v. Solomon,* 529 F.2d 59, 60–61 (2d Cir. 1975) (per curiam); *Home Insurance Co. v. Aetna Casualty & Surety Co.,* 528 F.2d 1388, 1390 (2d Cir. 1976) (per curiam); *Jaroslawicz v. Seedman,* 528 F.2d 727, 731 (2d Cir. 1975); *Judge v. City of Buffalo,* 524 F.2d 1321, 1322–23 (2d Cir. 1975).

**14.** The purpose for which the letters were included in the book, whether the book is bought because it contains the Rosenberg letters, the necessity for verbatim copying of the letters, and the effect of the use of the copyrighted letters on their future market are among the relevant factors which may be considered before there can be a decision as to the availability of the fair use defense to appellees.

The court did not address itself to the common law copyright count which was dismissed together with the statutory claim. Since it has been conceded that all material copied by appellees had been previously published, we affirm the dismissal of Count III.

Affirmed in part, reversed in part, and remanded for further proceedings in the light of this opinion.