**IOWA STATE UNIVERSITY RESEARCH FOUNDATION, INC., an Iowa Corporation, Plaintiff-Appellee,**

v.

**AMERICAN BROADCASTING COMPANIES, INC., a New York Corporation,**

**and**

**ABC Sports, Inc., a New York corporation, Defendants-Appellants.**

No. 1122, Docket 79–7819.

United States Court of Appeals,
Second Circuit.

Argued April 22, 1980.

Decided May 12, 1980.

Coudert Brothers, New York City (Michael J. Calvey, Dennis R. Pearson, Carleton G. Eldridge, Jr., New York City, of counsel), for defendants-appellants.

Leonard Horn, New York City (Sprung, Felfe, Horn, Lynch & Kramer, Ira J. Schaefer, New York City, of counsel), for plaintiff-appellee.

Before KAUFMAN, Chief Judge, OAKES, Circuit Judge, and WILL, District Judge.*

IRVING R. KAUFMAN, Chief Judge:

Appellants, the American Broadcasting Co. and ABC Sports, Inc. ("ABC"), ask this court to reverse a judgment entered against them in the district court. They urge us to hold that their copying and broadcast of portions of a student-produced film, without permission of the copyright holder, constitute "fair use," exempt from liability because the benefits of broad public dissemination outweighed any harm to the owner of the copyright. We disagree and affirm the judgment of the district court finding copyright infringement.

I

During the 1970-71 college term, James Doran and another student enrolled at Iowa State University, supervised by Professor Richard Kraemer, produced a 28-minute film titled *Champion*. It presented a short biography of a fellow student, Dan Gable, a champion wrestler who was destined to win a gold medal at the 1972 Munich Olympics. The film was financed jointly by appellee Iowa State University Research Foundation ("Iowa") and the Gable family, and chronicled Gable's quest for excellence in wres-

* Of the United States District Court for the Northern District of Illinois, sitting by designation.

tling. Throughout the film, comments by Gable, his family, coaches, and teammates accompanied footage of wrestling matches, training sessions, and Gable's home life. Iowa obtained a valid statutory copyright and retained all rights to *Champion*, except that it granted Doran the right to license its first television showing, but only with "the full knowledge and consent of the University." Doran proceeded to attempt, without success, to sell the television rights to a number of potential customers, including ABC, the National Broadcasting Co., and the Hughes Sports Network. Thus, prior to the summer of 1972, the film was rented exclusively to high school wrestling coaches, service organizations, and sports booster clubs.

In August 1972, Doran was employed by ABC as a temporary videotape operator, in connection with its telecast of the 1972 Summer Olympic Games in Munich. Toward the end of the month, with the Olympics fast approaching, Doran overheard ABC producers Don Ohlmeyer and Doug Wilson discussing a filmed biography of Dan Gable, which the network was planning to air as background material during the olympic telecast. When Doran heard Ohlmeyer complain that ABC's film crews had not provided enough footage of Gable suitable for use as biographical background, he informed the producer of the existence of *Champion*. At Ohlmeyer's request, Doran gave him a copy of the film, and ABC reproduced its own videotape of at least portions of the student work.[1]

At this point, the parties' accounts of the facts diverge. Ohlmeyer claims that, although he said he would attempt to provide $250 compensation for Doran, he advised him that he could not guarantee payment because of budget constraints. According to Ohlmeyer, Doran asserted he was not interested in monetary payment and would be pleased simply to have his film on television. Doran, on the other hand, alleges that Ohlmeyer promised to investigate compensation, but did not offer to purchase the film. As a result, Doran believed he had entered into no agreement, and that ABC was never granted any right to use *Champion*. Thus, Doran claimed he was "shocked" when he saw edited portions of *Champion* on ABC's olympic telecasts.

After Doran notified Iowa that the network had broadcast *Champion*, the University made several attempts to reach an amicable settlement with ABC. The network, however, repeatedly denied that any part of *Champion* had ever been used. Consequently, there never was any payment to Doran or Iowa. After Iowa filed this suit alleging copyright infringement in 1975, and following discovery, however, ABC admitted three uses of the film: (1) seven to twelve seconds of *Champion* were shown on ABC's pre-olympic telecast on August 25, 1972; (2) 2½ minutes were used as part of an ABC report on Gable before his first olympic wrestling match on August 27; and (3) eight seconds were telecast in connection with Gable's appearance on ABC's *Superstars* program in February 1974, after Iowa had first written the network about its use of *Champion* during the Olympics.[2] In ad-

1. The district court found that Ohlmeyer made a complete videotape copy of *Champion*. *See Iowa State Univ. Research Foundation, Inc. v. American Broadcasting Co.*, 463 F.Supp. 902, 904 (S.D.N.Y.1978) (Lumbard, J.). ABC argues strenuously that the record below is devoid of any evidence that Ohlmeyer copied the entire film, rendering the district judge's finding clearly erroneous. But, ABC did admit below that Ohlmeyer copied a "slightly longer" portion of *Champion* than was ever broadcast by the network. Moreover, the district court awarded the statutory minimum of $250 in damages based on this instance of copying. Thus, we find any error on this score harmless.

2. ABC's use of *Champion* as part of the *Superstars* broadcast was not considered by Judge Lumbard during the liability trial, but is discussed at some length in his opinion following separate proceedings devoted primarily to assessing damages. *See Iowa State Univ. Research Foundation, Inc. v. American Broadcasting Co.*, 475 F.Supp. 78, 79 & n.1 (S.D.N.Y. 1979). The network insists that the judge could not have found "copying," as a matter of law, because he never viewed the *Superstars* program. Thus, ABC claims, he could not have concluded that *Superstars* and *Champion* are "substantially similar," an ingredient necessary to a finding of infringement. *See, e. g., Hoehling v. Universal City Studios, Inc.*, 618 F.2d

dition, Circuit Judge Lumbard (sitting by designation as the trial judge) found that Ohlmeyer's original production of a videotape of at least portions of the film constituted a fourth instance of infringement. See note 1 supra.[3]

Although ABC thus admitted virtually all allegations of copying, it raised the defense of fair use. Following a two-day bench trial on the issue of liability in September 1978, Judge Lumbard rejected the defense, finding that no agreement had ever been reached by Doran and ABC. Indeed, he noted, Iowa had not been consulted prior to the network's telecasts of portions of *Champion*, and was therefore unable to "consent" to ABC's use as required by its own agreement with Doran. Accordingly, the judge found that "defendants appropriated something of value for which, from the nature and extent of their business, they were well prepared to pay," rendering their use of *Champion* "unfair."[4] After a subsequent trial on damages in May 1979, Judge Lumbard awarded statutory damages of $15,250 —$250 for ABC's initial copying of the film, and $5000 for each of the three televised uses. He also awarded $17,500 in attorneys' fees. On this appeal, ABC does not challenge the amount or computation of damages and fees, but urges that the district court incorrectly rejected its defense of fair use.

## II

The doctrine of fair use, originally created and articulated in case law, permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster. The cases emphasize that resolution of a fair use claim "depends on an examination of the facts in each case [and] cannot be determined by resort to any arbitrary rules or fixed criteria." *Meeropol v. Nizer*, 560 F.2d 1061, 1068 (2d Cir. 1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978). Evolution of the doctrine in these cases, however, suggests four commonly recognized factors that have traditionally been consulted in fair use cases: [5] (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of material used in relation to the copyrighted work as a whole; and (4) the effect of the use on the copyright holder's potential market for the work. *See* 3 *Nimmer on Copyright* § 13.05[A] (1979); 17 U.S.C. § 107. Resort to these factors in the case before us demonstrates that ABC's fair use defense must fail.

The network relies most heavily on the first factor—the purpose and character of its use. It claims it was engaged in the laudable pursuit of disseminating the life history of an important public figure involved in an event of intense public interest. Thus, ABC asserts that the public benefit in encouraging the development of historical and biographical works suitable for mass distribution, *see Rosemont Enterpris-*

---

972, 977 (2d Cir. 1980); 3 *Nimmer on Copyright* § 13.03 (1979). During the proceedings, however, ABC's counsel assured Judge Lumbard that there was no dispute between the parties over the fact that an eight second segment of *Champion* was used in *Superstars*. Accordingly, the district judge did not err when he concluded that "[s]ince ABC conceded this third infringement, . . . Iowa State was not required to screen the offending portions of 'Superstars.'" *Iowa State Univ. Research Foundation, Inc., supra*, 475 F.Supp. at 79. Indeed, the judge *did* view the eight seconds of *Champion* at issue, since it was included in the 2½ minute segment telecast during the Olympics.

3. It is undisputed that no significant audio portions of *Champion* were ever used by ABC, and

that the network edited and re-arranged the segments it did broadcast.

4. *Iowa State Univ. Research Foundation, Inc. v. American Broadcasting Co.*, 463 F.Supp. 902, 905 (S.D.N.Y.1978). The district court did, however, reject Iowa's claim that another seven-minute biography of Gable, telecast during the Olympics and featuring ABC's own film, infringed its copyright in *Champion*. Iowa has not appealed from this holding.

5. The four "fair use" factors are now codified in 17 U.S.C. § 107 of the 1976 Copyright Act. The new statute, however, does not govern the instant case, since Iowa's copyright was secured before the 1976 Act took effect.

*es, Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir. 1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed. 546 (1967), should impel us to the conclusion that it be free to use *Champion* for this purpose.

 This argument proves too much. ABC possessed an unfettered right to use any factual information revealed in *Champion* for the purpose of enlightening its audience, *see Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980); *Meeropol, supra*, 560 F.2d at 1070; *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 95 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978), but it can claim no need to "bodily appropriate" Iowa's "expression" of that information by utilizing portions of the actual film, *Hoehling, supra*, 618 F.2d at 980; *Rosemont Enterprises, Inc., supra*, 366 F.2d at 310; *Meeropol, supra*, 560 F.2d at 1070. *See generally*, 1 *Nimmer on Copyright* § 1.10[B]; Gorman, *Copyright Protection for the Collection and Representation of Facts*, 76 Harv.L.Rev. 1569 (1963). The public interest in the free flow of information is assured by the law's refusal to recognize a valid copyright in facts. *Cf. Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 569, 97 S.Ct. 2849, 2854, 53 L.Ed.2d 965 (1977) (under state statute analogous to copyright law, television newscast could report fact of performance, but could not broadcast actual event without compensating performer). The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance. Indeed, we do not suppose that appellants would embrace their own defense theory if another litigant

sought to apply it to the ABC evening news.[6]

 Moreover, we must recognize that ABC's use of *Champion* was not motivated solely by its beneficence. While the fact that ABC sought to profit financially from its telecasts of the Olympics "does not, standing alone, deprive . . . [ABC] of the fair use defense," *Meeropol, supra*, 560 F.2d at 1069, "it is relevant" that the film was used, at least in part, for "commercial exploitation," *id.* Thus, on balance, we cannot conclude that the purpose of ABC's use indicates the propriety of a finding of fair use.

ABC also urges that the "nature of the copyrighted work" was essentially different from that of the network's olympic broadcasts, characterizing *Champion* as an "educational" film with no significant television market. Nevertheless, the award of television rights to Doran by contract suggests that Iowa contemplated television exposure from the outset, and not merely rental of an educational film to civic groups. Indeed, ABC's short vignettes on the lives of olympic athletes, which figured prominently in its 1972 olympic coverage, are essentially of the same genre as *Champion*. "[W]here the two works in issue fulfill the same function," we are instructed by Professor Nimmer, the "scope of fair use is . . . constricted." 3 *Nimmer on Copyright* § 13.05[B], at 13–58.

In discussing the third fair use factor, ABC stresses that it used only 2½ minutes of a 28-minute film, suggesting that such limited copying is insignificant. But ABC actually broadcast approximately eight percent of *Champion*, some of it on three separate occasions. Obviously, ABC found this

**6.** We need not address ABC's argument, based primarily on *Time Inc. v. Bernard Geis Associates*, 293 F.Supp. 130 (S.D.N.Y.1968), that the factual information contained in a film may be inextricably related to the film's expression of that information, rendering use of the latter necessary to secure broad distribution of the former. *See* 1 *Nimmer on Copyright* § 1.10[B], at 1–83; Note, *Copyright Infringement and the First Amendment*, 79 Colum.L.Rev. 320, 328–35 (1979). *Geis* involved an author's unauthorized use of the Zapruder film of the Kennedy assassination. In this almost unique instance, it is at least arguable that the informational value of that film cannot be separated from the photographer's expression, *see* 1 *Nimmer on Copyright* § 1.10[B], at 1–83, thereby indicating that both should be in the public domain. We believe, however, that such situations are rare. *See* Note, *supra*, at 335. In any event, *Champion* does not fall within this limited category.

footage essential, or at least of some importance, whenever it had occasion to refer to the career of Dan Gable.

Finally, ABC asserts that there was no significant adverse effect on the market for *Champion* as a result of its broadcasts of the film. The network relies on Judge Lumbard's finding, in the damages trial, that Iowa "certainly has not shown that ABC's use of 'Champion' usurped the entire market value of the film. . . . Indeed, the evidence available suggests that the market value of 'Champion' increased after ABC's offending telecasts" due to a dramatic upsurge in demand for rentals of the film. *Iowa State Univ. Research Foundation, Inc. v. American Broadcasting Co.*, 475 F.Supp. 78, 81 (S.D.N.Y. Aug. 9, 1979). Nevertheless, we believe that ABC did foreclose a significant potential market to Iowa—sale of its film for use on television in connection with the Olympics. In fact, because of its exclusive right to televise the games, ABC monopolized that market. When ABC telecast *Champion* without purchasing the film, it usurped an extremely significant market. Iowa had no right to insist that the network use its film, but its copyright entitled it to attempt to exploit the commercial market controlled by ABC, and, if it could not, to withhold permission to use the film in that market. *Accord*, 3 *Nimmer on Copyright* § 13.05[B].

■ Our conclusion that the fair use defense is unavailable to ABC is bolstered by the equitable considerations relied upon by Judge Lumbard below. We cannot ignore the fact, found by the district judge, that ABC copied *Champion* while purporting to assess its value for possible purchase, or that the network repeatedly denied that it had ever used the film. Bearing in mind, as we must, that the fair use doctrine "is entirely equitable," *Time Inc. v. Bernard Geis Associates*, 293 F.Supp. 130, 144 (S.D. N.Y.1968), we agree with Judge Lumbard that ABC's conduct in the instant case is not irrelevant to the fairness of its use.

Affirmed.