TO BE PUBLISHED IN THE OFFICIAL REPORTS


OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General


```
-------------------------------------------
                             :
     OPINION      :
                             :
  JOHN K. VAN DE KAMP   :          No.  86-801
    Attorney General    :
                             :        JANAURY 21, 1988
  RONALD M. WEISKOPF         :
  Deputy Attorney General    :
                             :
----------------------------------------------------------------
```


THE HONORABLE C. A. TERHUNE, DIRECTOR, DEPARTMENT OF THE YOUTH AUTHORITY, has requested an opinion on the following questions:

1.  Would the videorecording by employees of the Youth Authority of regularly broadcast television programs of copyrighted motion pictures and other audiovisual works for showing at a later time to institutionalized Youth Authority wards constitute an infringement of copyright?

2.  Would the showing of prerecorded store-bought or rented videocassettes of copyrighted motion pictures to institutionalized Youth Authority wards constitute an infringement of copyright?

3. Would the use of a satellite dish to receive regularly broadcast television programs for viewing by employees of the Youth Authority who reside in state-owned housing on the grounds of Youth Authority institutions and by institutionalized Youth Authority wards constitute a violation of law?

CONCLUSION

1.  The prior videorecording by employees of the Youth Authority of regularly broadcast television programs of copyrighted motion pictures and other audiovisual works for showing at a later time to institutionalized Youth Authority wards would not constitute an infringement of copyright.

2. The showing of prerecorded store-bought or rented videocassettes of copyrighted motion pictures to institutionalized Youth Authority wards would constitute an infringement of copyright.

3. The use of a satellite dish to receive regularly broadcast television programs for viewing by employees of the Youth Authority who reside in state owned housing on the grounds of Youth Authority institutions and by institutionalized Youth Authority wards would not constitute a violation of law.

## ANALYSIS

A number of the institutional facilities of the California Department of Youth Authority are situated at locations where regular television broadcasts are difficult to receive and the Department wishes to know if it might redress their lack of normally available programing with the aid of certain commercially-available instruments of new technology, namely the videorecorder and the satellite dish.

Most of the institutions' living unit day rooms are equipped with television sets. A videorecorder would enable the Authority's wards to view movies from prerecorded videocassettes that the Authority would purchase or rent through normal commercial outlets, or movies and other programs that Authority personnel would record off-the-air at an earlier time when reception permitted. "Time-shifting" would also permit Authority personnel to have the wards view programs at a time more consistent with the institution's schedule and needs. A satellite dish would enable the staff and wards of a particular institution to receive regularly broadcast television programs they could not otherwise receive with a standard antenna because of the location of their facility.[1]

Since many of the programs the Authority would receive involve motion pictures and other audiovisual works protected by the Copyright Act of 1976 and since the use of the satellite dish is restricted by section 705 of the Communications Act of 1934, as recently amended by the Cable Communications Policy Act of 1984, the Authority asks for an opinion as to the legality of its proposed undertakings. The laws involved operate independently (cf. id., § 705, subsec. (e)) and examining each in turn we will conclude that (1) while the "time-shifting" of television programs for showing to the wards would not violate the Copyright Act, (2) the showing of prerecorded videocassettes would violate that Act, and (3) the use of satellite dishes to receive regularly broadcast commercial television programs would not violate the Communications Act as amended.

The Copyright Act

---

[1]The Authority is only interested in receiving those programs which are broadcast for use of the general public and which anyone might receive without subscription or fee with an ordinary antenna, and not in "pirating" signals with its satellite dish.

The Copyright Act of 1976[2] declares copyright protection to subsist in accordance with its terms in "original works of authorship" fixed in any tangible medium of expression from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. (§ 102, subsec. (a).) "Works of authorship" is defined to include "motion pictures and other audiovisual works." (Id., subsec. (a)(6).)[3]

Section 106 of the Act grants a copyright holder "exclusive rights" to do (or to authorize others to do) certain things with his copyrighted work. Among them is to reproduce the work in copies (id., § 106(1)), and in the case of motion pictures or other audiovisual works, to perform it publicly (id., § 106(4)).[4] To perform a work publicly is defined to mean, inter alia,

---

[2]Public Law 94-553, title I (90 Stat. 2541) codified to title 17 of the United States Code.

[3]An "audiovisual work" is one that "consist[s] of a series of related images which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied." (§ 101.) "Motion pictures" are "audiovisual works consisting of a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds, if any." (Ibid.) "Most commercial television programs, if fixed on film or tape at the time of broadcast qualify as 'audiovisual works'." (Sony Corp. v. Universal City Studios, Inc. (1984) 464 U.S. 417, 461, fn. 5 (dis. opn. of Blackmun, J.).) They may also qualify as dramatic, musical or other type of work. (Ibid.)

[4]Section 106 provides:

"Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

"(1) to reproduce the copyrighted work in copies or phonorecords;

"(2) to prepare derivative works based upon the copyrighted work;

"(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

"(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and

"(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted

performing it at "any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered." (§ 101; fn. 8, post.)

Anyone who violates these, or any of the other "exclusive rights" of the copyright owner, is an infringer of the copyright (§ 501(a)), and "the Copyright Act provides the owner with a potent arsenal of remedies against the infringer, including an injunction to restrain the infringer from violating his rights, the impoundment and destruction of all reproductions of his work made in violation of his rights, a recovery of his actual damages and any additional profits realized by the infringer or a recovery of statutory damages, and attorney's fees (§§ 502-505)." (Sony Corp. v. Universal City Studios, Inc. (1984) 464 U.S. 417, 435.)

The rights secured by copyright, however, are wholly statutory and are measured by the parameters of the Copyright Act passed in exercise of the power vested in Congress by Article I, section 8 of the Constitution.[5] (65 Ops.Cal.Atty.Gen. 106, 108; cf. Sony Corp. v. Universal City Studios, Inc., supra, 464 U.S. at 429, 431, 447.) As given, the "exclusive rights" granted by section 106 to a copyright owner are "qualified" since they are specifically subject to the provisions of sections 107 through 118 of the Act which provide various limitations, qualifications and exemptions upon them. (Id. at 447.) "Section 107 compels a finding of noninfringement if the use made of a copyrighted work is a 'fair use' under the particular circumstances, while sections 108 through 118 provide exemptions for particular situations." (65 Ops.Cal.Atty.Gen., supra, at 106-107.) With respect to the former qualification, as the high court has said, "Any individual may reproduce a copyrighted work for a 'fair use'; the copyright owner does not possess the exclusive right to such a use." (Sony Corp. v. Universal City Studios, Inc., supra, at 433.) And section 107 itself states that the "fair use" of a copyrighted work, "is not an infringement of copyright." (§ 107; cf. 65 Ops.Cal.Atty.Gen., supra, at 111.)

The Youth Authority would utilize its videorecorders to show copyrighted motion pictures and other audiovisual works from videocassettes with two different sources. One would be tapes of works that Youth Authority personnel will have themselves recorded off-the-air from regularly broadcast television programs. (Again, no copying of programs transmitted on pay or cable television is intended.) The other would be store-bought or rented cassettes whereon a copyrighted work will have already been recorded. We discuss the propriety of each under the Copyright Act.

_____

work publicly."

[5]Article 8, section 1 of the Constitution provides that "Congress shall have the power . . . to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." "Pursuant to this grant of authority Congress enacted a copyright law at its very first session in 1790 (1 Stats. at L. (Peters), ch. 15, p. 124 . . . and from time to time . . . has amended and revised it to reflect new technologies . . . ." (65 Ops.Cal.Atty.Gen., supra, at 108.)

Question No. 1: Off-The-Air Recording
For Later Viewing ("Time-Shifting")

Making a videocassette of an audiovisual work for later viewing, as in the circumstance described, constitutes a reproduction of it in copy within the meaning of section 106, clause (1). (Sony Corp. v. Universal City Studios, Inc., supra, 464 U.S. 446-456; id., at 463-475 (dis. opn. of Blackmun J.; S.Rept. [No. 94-473] at 58; H.Rept. [No. 1476] at 61.)[6] Its then being played back, i.e., shown at a later time, constitutes a "performance" within the meaning of section 106, clause (4) (Columbia Pictures Industries, Inc. v. AVECO, Inc. (3rd Cir. 1986) 800 F.2d 59, 62; Columbia Pictures Industries v. Redd Horne (3rd Cir. 1984) 749 F.2d 154, 158; 65

_____

[6]The Report of the House Committee on the Judiciary on the Copyright Act (No. 94-1476; 94th Cong. 2d Sess.) cited herein as H.Rept. is reprinted with references given to its pagination in [1976] U.S. Code Congressional and Administrative News (vol. 5) at pages 5659-5809 and without such reference in the annotations following the appropriate sections in title 17, United States Code Annotated. The corresponding Report of the Senate Committee on the Judiciary (No. 94-473), cited herein as S.Rept., is not as available.

As Justice Blackmun points out, both the Senate and House Reports state that although the reference in clause (1) of section 106 is to "copies", that is intended there, as elsewhere in the Act, to include the singular (S.Rept. at 58, H.Rept. at 61) (Sony Corp. v. Universal City Studios, Inc., supra, at 463 (dis. opn.)) and that the Reports also describe the reproduction right established by clause (1):

> "[T]he right 'to reproduce the copyrighted work in copies or phonorecords' means the right to produce a material object in which the work is duplicated, transcribed, imitated, or simulated in a fixed form from which it can be 'perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.' [Cf. § 101 (definition of copy).] As under the present law, a copyrighted work would be infringed by reproducing it in whole or in any substantial part, and by duplicating it exactly or by imitation or simulation." (S.Rept. at 58; H.Rept. at 61.)

Justice Blackmun then states: "The making of even a single videotape recording at home falls within this definition; the VTR user produces a material object from which the copyrighted work later can be perceived." (Sony, dis. opn., at 464.) The majority in Sony did not take issue with that characterization, but held that making a copy of a copyrighted work for later home viewing was a "fair use" of the work and not an infringement.

Ops.Cal.Atty.Gen., <u>supra</u>, at 109)[7] and to the extent that the playback/showing is "public", it also would be protected under that clause. Infringement of copyright would occur unless the use of the material is a "fair" one.

In <u>Sony Corp.</u> v. <u>Universal City Studios</u>, <u>supra</u>, 464 U.S. 417 [hereinafter "<u>Sony</u>"] the high court held that the noncommercial home use recording and "time-shifting" for later viewing of copyrighted material broadcast over the public airwaves did not constitute a copyright infringement. (<u>Id.</u> at 447-453.) While the initial copying of the material came within the protection of section 106, clause (1) (<u>id.</u> at 433), the court found the private, home viewing of the copied result to be a "fair use" of the material. (<u>Id.</u> at 455.) Since the case involved private home recording and playback, no issue was raised about a "public" performance (<u>id.</u> at 425) and section 106, clause (4) did not come into play. However it does here and we must first address that threshold issue.

In 65 Ops.Cal.Atty.Gen. 106 (1982) we were asked whether the showing of videocassette tapes of copyrighted motion pictures to prison inmates by correctional authorities constituted an infringement of copyright. We concluded it was since: (a) the showing was a protected "public performance" within the meaning of section 106(4), and (b) it did not amount to a "fair use" of the material (§ 107). (65 Ops.Cal.Atty.Gen. 106, 107-108, 110, 117, 119, <u>supra</u>.)

On that first issue, here we are told that most of the day rooms in the living units of the Authority's institutions are equipped with television sets and that the number of persons who might watch one at any given time may range from only a few to as many as 40 or 50, but whatever the number, it would only be of persons assigned to a particular living unit who were not otherwise occupied or restricted. As mentioned, in 65 Ops.Cal.Atty.Gen. 107, <u>supra</u>, we concluded that the showing of videocassettes of motion pictures and other audiovisual works to inmates in correctional institutions constitutes a "public performance" of such works for the purposes of determining copyright infringement. (<u>Id.</u> at 109-110.) We did so on the ground that despite the fact that the inmates were involuntarily incarcerated and a prison is not a "public place", still the place where the showing was to take place fit the literal wording of the statutory description of what it means "to perform a work publicly", to wit, to perform it at "a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances

---

[7]To "perform" a work means "to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible." (§ 101.)

is gathered." (§ 101.)[8] (65 Ops.Cal.Atty.Gen., supra, at 109-110.)

We see little difference between that situation and the showing of videocassettes of similar materials to institutionalized Youth Authority wards. For the purpose of this opinion then we will follow our former resolution of the matter and conclude that the showing of videocassettes to Youth Authority wards in their living unit day rooms similarly constitutes a "public performance" of the recorded works. Being such, where "time-shifting" is involved, the initial recording would be subject to the copyright holder's exclusive right to authorize the making of copies of his works (§ 106(1)) and their later showing would be subject to his right to authorize "public performances" of them (§ 106(4)), and copyright infringement would occur unless the activity is a "fair use" of the material. (§ 107.)

"'Fair use' is best understood as 'a privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner.' [Citation.]" Supermarket of Homes v. San Fernando Valley Bd. (9th Cir. 1986) 786 F.2d 1400, 1408.) It was developed by the courts in cases arising under the 1909 Copyright Law as an "equitable rule of reason" to balance the competing interests between creators of copyrighted works and the general public. (65 Ops.Cal.Atty.Gen., supra, at 111; cf. Sony, 464 U.S. at 447-448 & 447, fn. 29.) Legislative recognition of the rule is found in section 107, which sets forth a number of factors to be considered in balancing the equities in determining whether the principles of the doctrine apply in a particular case. The section provides:

> "Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use) scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--

---

[8]Section 101 provides that

> "To perform a work publicly means (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or (2) to transmit or otherwise communicate a performance of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." (§ 101.)

"(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

"(2) the nature of the copyrighted work;

"(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

"(4) the effect of the use upon the potential market for or value of the copyrighted work."

As mentioned, in 65 Ops.Cal.Atty.Gen. 106, <u>supra</u>, we concluded that the showing of videocassettes of copyrighted materials to incarcerated inmates by correctional authorities was an infringement of copyright because, inter alia, the activity did not constitute a "fair use" of the copyrighted works.  (<u>Id.</u>

at 117.)  Our conclusion was perforce predicated on the decision of the Ninth Circuit Court of Appeals in Universal City Studios v. Sony Corp. of America (9th Cir. 1981) 659 F.2d 963, which seriously circumscribed our analysis on the fair use issue in material respects.  (See, e.g., 65 Ops.Cal.Atty.Gen. 106, 112, 113, 116, supra; cf. Martin v. Martin (1970) 2 Cal.3d 752, 761-762; People v. Rath Packing Company, Inc. (1978) 85 Cal.App.3d 308, 323 & 323 fn. 10; Swaffield v. Universal Ecsco Corp. (1969) 271 Cal.App.2d 147, 160.)  Inasmuch as the Supreme Court in Sony subsequently rejected crucial aspects of the "fair use" analysis undertaken by the Ninth Circuit that we followed (see Sony at 447-455 & 455, fn. 40; cf. fn. 9, post), this question, and more so the one that follows, calls upon us to reexamine that aspect of our former opinion in light of the later development.  Doing so we can now proceed to analyze our situation vis-a-vis the four factors of "fair use" analysis and balance the equities in its case.[9]

_____

[9]We could not directly proceed before.  In Universal City Studios v. Sony Corp. of America, supra, 659 F.2d 963, the Ninth Circuit Court of Appeals had pointed out that before one can proceed to apply the four factors of section 107 to determine "fair use" in a particular case one must first determine whether the doctrine is even available in it.  (659 F.2d at 970, 971-972.)  The court stated a conviction that without a 'productive use', as when copyrighted material is totally reproduced and taken for its intrinsic use with nothing added by the user, application of the doctrine is precluded.  (Id. at 971-972.)  Needless to say, that view of the doctrine colored the courts' subsequent analysis of the four factors themselves (see e.g., id. at 971, 972, 973) as well as ours.

Although we questioned whether the legislative history upon which the court relied supported its limitation on the "fair use" doctrine to "productive uses" (65 Ops.Cal.Atty.Gen., supra, at 113, fn. 9), we felt constrained to follow, and so seriously questioned whether the "fair use" doctrine could be available when movies were shown in a prison for "entertainment" purposes.  (Id. at 113.)  The United States Supreme Court subsequently declared the Ninth Circuit's understanding of the "fair use" doctrine to be erroneous:

> "The Court of Appeals chose not to engage in any 'equitable rule of reason' analysis in this case.  Instead, it assumed that the category of 'fair use' is rigidly circumscribed by a requirement that every such use must be 'productive'.  It therefore concluded that copying a television program merely to enable the viewer to receive information or entertainment that he would otherwise miss because of a personal scheduling conflict could never be fair use.  That understanding of 'fair use' was erroneous."  (464 U.S. at 455, fn. 40; emphasis added.)

The first factor asks us to consider <u>the purpose and character of the use</u>. Here it is clear that the use with which we deal is noncommercial, and while that characterization is not necessarily conclusive on the overall issue, it does raise a presumption that the use involved is a "fair" one. (<u>Sony</u> at 449.)

What is contemplated though is for movies and other audiovisual works to be "taken" from the air in their entirety and shown to Youth Authority wards with their "entertainment" as a motivating factor. With that as a purpose, the Ninth Circuit and we had found it to be less likely that a claim of "fair use" could be accepted, largely because such a use was not "productive". (659 F.2d at 970, 972 & 972, fn. 10; 65 Ops.Cal.Atty.Gen. at 114.) But the Supreme Court subsequently said that was not so, and that a purpose to entertain is not necessarily inconsistent with "fair use":

> "Making a copy of a copyrighted work for the convenience of a blind person is expressly identified by the House Committee Report as an example of fair use, <u>with no suggestion that anything more than a purpose to entertain or to inform need motivate the copying. In a hospital setting, using a VCR to enable a patient to see programs he would otherwise miss has no productive purpose other than contributing to the psychological well-being of the patient</u>. Virtually any time-shifting that increases viewer access to television programming may result in a comparable benefit." (<u>Sony</u>, at 455, fn. 40; emphasis added; see also fn. 9, <u>ante</u>.)

In the situation presented, the showing of time-shifted programs to the wards, even if only for their "entertainment", could similarly be "fair": It could contribute to their psychological well-being, do much to dissipate their isolation, and reaffirm their connection with the "outside". (Cf. 65 Ops.Cal.Atty.Gen. at 114, fn. 10.) Furthermore, inasmuch as the line between "mere entertainment" and the "transmission of ideas" is often much too "elusive to draw" (cf. <u>Stanley</u> v. <u>Georgia</u> (1969) 394 U.S. 557, 566), courts in copyright cases have hesitated to absolutely characterize a use or a work as involving one or the other. (See e.g., <u>Berlin</u> v. <u>E. C. Publications, Inc.</u> (2nd Cir. 1964) 329 F.2d 541, 545; <u>Universal City Studios</u> v. <u>Sony Corp. of Amer.</u> (C.D.Cal. 1979) 480 F.Supp. 429, 452.)

"Time-shifting" of television programs presents a special "fair use" situation for the owner of copyrighted material has placed his work in a medium that is designed for it to be received by as many persons as possible free of charge. (Cf. <u>Sony</u> at 449, 454; <u>Teleprompter Corp.</u> v. <u>CBS</u> (1974) 415 U.S. 394, 411-413; <u>Universal City Studios</u> v. <u>Sony Corp. of Amer.</u>, <u>supra</u>, 480 F.Supp. at 453, 466.) This becomes important with respect to factor 4, the issue of harm, but it is also pertinent with respect to the first factor we deal with. In <u>Sony</u> the high court noted a public interest in making television more available and said that "to the extent that time-shifting expands public access to freely broadcast television programs, it yields societal benefits." (464 U.S. at 454.) In this regard we can see how time-shifting can give Youth Authority personnel an important tool to further the ends of the Juvenile Court Law. Freely broadcast motion pictures and other audiovisual works, even if produced primarily for entertainment, also serve as a vehicle of contemporary social commentary and their being shown to the wards may not only be for their entertainment, but also as part of an effort toward their education and rehabilitation to help them return as productive

members of society. (Cf. 65 Ops.Cal.Atty.Gen. at 114 & 114, fn. 10.) And whatever motivates their showing, videocassette technology also permits Authority personnel "greater flexibility in accommodating concerns of security to the presentation of such materials. (Cf. S.Rept., at p. 64 (recording of an instructional transmission for the purposes of delayed viewing by students in a remote area constitutes fair use).)" (65 Ops.Cal.Atty.Gen. at 114; cf. Sony at 455, fn. 40 quoted supra.)

The use of the copyrighted works as described can thus advance important public interests, to which a copyright holder's rights (especially in view of the real lack of harm, discussed post) have been said to yield. As was quoted in Universal City Studios v. Sony Corp. of Amer., supra, 480 F.Supp. 429, 448:

"[An] author [should expect] that the copyright scheme itself will sometimes require use of his work necessary in the public interest for which he will not be paid, and society expects that the copyright scheme will either allow such use without reducing the author's incentive or impose no excessive burdens on the public when use is controlled. . . . L. Seltzer, Exemptions and Fair Use in Copyright, at 30 (1978)." (Modifications ours.)

Upon these considerations we find that factor one favors a finding of "fair use" even though the nature and character of the use may be for "entertainment".

Factor two has us consider the nature of the copyrighted work, and factor three, the amount "taken" by the user.

The materials involved in the first question are copyrighted motion pictures or other audiovisual works that have been reduced to videocassette, no doubt in their entirety, by Authority personnel from a free television broadcast so they may be shown at a later time because of scheduling convenience, or security purposes, or because of only then-available reception. That source for reduction of a copyrighted work, the television broadcast, has sometimes been described as a secondary means by which its copyright is exploited. In our former opinion we described the industry practice as follows:

". . . exploitation of the [television market as well as the] videotape medium normally occurs after the basic motion picture or other audiovisual work has already been exhaustively exploited in its first runs in motion picture theaters. In other words, with a few possible exceptions, the copyrighted works are made available on [television and] the videocassette medium only after their economic potential from their primary original and first use (in the theaters) has been realized, and it is only at this juncture that the copyright holder tries to exploit the work through subsidiary means, such as by showing it on television and in a number of delayed subruns at motion picture theaters, and by having it placed on the videocassette medium." (65 Ops.Cal.Atty.Gen. at 116.)

Of course many copyrighted works are designed primarily for television, which is to be the primary market for their exploitation. But it is not important that the medium is described as primary or secondary. What is important is how it colors the nature of the copyrighted works made available in it, for the nature of a copyrighted work at the time it is created is not determinative in determining "fair use", and one must look instead to its nature at the time it is used. (Universal City Studios v. Sony Corp. of Amer., supra, 480 F.Supp. at 453.) As was noted in the Sony litigation, the television market "involves only that copyrighted material which [the owners] voluntarily choose to have telecast over public airwaves to individual homes free of charge" (480 F.Supp. at 453) and time-shifting merely enables a viewer to "fairly" see such a work at his convenience which he would otherwise miss. (464 U.S. at 449.) We find that this nature of the copyrighted works when they are used favors a finding of "fair use". The fact that they will be taken in their entirety does not preclude that finding.

Looking to the substantiality of a taking (factor 3) in the "fair use" calculus "arose in the context of cases involving 'parodies' where the question was whether the parodist appropriated a greater amount of the original work than was necessary to create the criticism or satire [citations] and . . . some courts have held that those cases are to be treated differently from other cases [citations]." (65 Ops.Cal.Atty.Gen., supra, at 115, fn. 13.) In any event, the factor is but one to be considered along with the other factors set forth in section 107 in balancing the equities in a copyright case, and the taking or use of a whole work can still constitute a "fair use" where there is "no accompanying reduction in the market for '[the] original work.'" (Universal City Studios v. Sony Corp. of Amer., supra, at 454; accord, Meeropol v. Nizer (2nd Cir. 1977) 560 F.2d 1061, 1069-1070.) And, as the high court said in the Sony case:

> "[W]hen one considers the nature of a television copyrighted audiovisual work [as we have just done], and that time-shifting merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge, the fact that the entire work is reproduced, see § 107(3), does not have its ordinary effect of militating against a finding of fair use." (464 U.S. at 449-450; fn. omitted.)

We therefore turn to the last factor of "fair use" analysis, the effect upon the owner's market.

The fourth factor for consideration, commonly known as the issue of harm, "is undoubtedly the single most important element of fair use." (Harper & Row v. Nation Enterprises (1985) 471 U.S. 539, 566.) In analyzing the harm or potential harm to a copyright holder, courts have focused on considerations such as whether the defendants' use "tends to diminish or prejudice the potential sale of plaintiff's work" (e.g., Meeropol v. Nizer, supra, 560 F.2d at 1070; Marvin Worth Productions v. Superior Films Corp. (S.D.N.Y. 1970) 319 F.Supp. 1269, 1274), whether the use "has tended to interfere with the marketability of the copyrighted work" (e.g., Elsmere Music, Inc. v. National Broadcasting Co. (S.D.N.Y. 1980) 482 F.Supp. 741, 747), or whether the use has the intent or effect of "fulfilling the demand for the original work" (e.g., Wainwright Sec. v. Wall St. Transcript Corp. (2nd Cir. 1977) 558 F.2d 91, 96; Berlin v. E. C. Publications, Inc., supra, 329 F.2d 541, 545). And recently we learned that where a noncommercial use is involved as it is here, there must be a showing that some meaningful likelihood of future harm exists, either because the

particular use is itself harmful, or because if it should become widespread it would adversely affect the potential market for the copyrighted work. (Sony, at 451.)

As explained, there are several potential markets for the type of copyrighted work we have here--the theater, television broadcasts, films and videocassettes rentals and sales. We do not believe any will be compromised by the Authority's "time-shifting" live television broadcasts.

In Sony the high court, as had the District Court, found that the use of a videorecorder to "time-shift" commercial television broadcasts of copyrighted works does not result in material harm to the owners. (Id. at 451-455, citing Universal City Studios v. Sony Corp. of Amer., supra, 480 F.Supp. at 466-469; see also Sony at 453.) The plaintiffs at trial had admitted that no actual harm had occurred to their copyrights (464 U.S. at 451 citing 480 F.Supp. at 467; and see Sony at 439), and the District Court rejected their fears that: (a) live television or movie (theater) audiences would decrease because of time-shifting (Sony at 452-453 & 453, fn. 37 quoting 480 F.Supp. at 466-468); or (b) that "time-shifting will reduce audiences for telecast reruns" (Sony at 453 & 453, fn. 38, quoting 480 F.Supp. at 466). It also rejected their suggestion that "theater or film rental exhibition would suffer because of time-shift recording of [a] program" as lacking merit. (Sony at 453 & 453, fn. 39, quoting 480 F.Supp. at 467.) In fact, evidence at trial had shown that company profits had increased after the introduction of videorecorder technology. (Sony at 454; 480 F.Supp. at 439-440, 452, 469; cf. Twentieth Century Music Corp. v. Aiken (1975) 422 U.S. 151 & 163 fn. 14; see also, R. P. Lawrence, Local Firm Leader In Scramble For TV Movies, San Diego Union, Jan. 24, 1982, Currents Arts (§ E) p. 1; J. Lardner, How Hollywood Learned To Stop Worrying and Love The VCR, L.A. Times Magazine, Apr. 19, 1987.) In particular the District Court had found and the high court accepted, that since measurement of ratings allows the videorecording audience to be reflected in the all-important audience ratings, time-shifting, by enabling more people to view a program than would otherwise see it, would aid the copyright holder rather than harm him, because inter alia, he can demand a higher price for rerun rights. (Sony, at 452-453 & 452, fn. 36, 453, fn. 38, citing & quoting 480 F.Supp. 466-468; see also, Sony, at 454-455; 480 F.Supp. at 452-453; cf. Teleprompter Corp. v. CBS, supra, 415 U.S. 394, 411-412.)

One of the salient characteristics of copyrighted works broadcast on live television is that the generation of profits from their exploitation in that medium is unlike that in other media, such as films in theaters, live dramatic performances and sales and rentals of videocassettes, because with television there is no direct economic relationship between the copyright holder and those who enjoy the work. (Teleprompter Corp. v. CBS, supra, 415 U.S. at 411-412.) In the Sony litigation, the District Court found this characteristic to be inexorably intertwined with the issue of harm because the lack of a direct economic relationship between the viewer and the holder makes harm to the latter from infringing activities of the former "more speculative". (480 F.Supp. at 453.) But, as the high court said, given the public interest in making television broadcasting more available, the concept of fair use should not be interpreted to permit mere speculation of harm to defeat a use of broadcast material which achieves that end:

"The District Court's conclusions are buttressed by the fact that to the extent time-shifting expands public access to freely broadcast television programs, it yields

societal benefits.  In Community Television of Southern California v. Gottfried, 459 U.S. 498, 508, n. 12 (1983), we acknowledged the public interest in making television broadcasting more available.  Concededly, that interest is not unlimited.  But it supports an interpretation of the concept of 'fair use' that requires the copyright holder to demonstrate some likelihood of harm before he may condemn a private act of time-shifting as a violation of federal law."  (464 U.S. at 454.)

Again, no such harm to a copyright holder's other markets was found in Sony because of "time-shifting" activities:  as the courts observed, interest in the theater market for a copyrighted work was no more likely to "be reduced by [video]recording than it already is by the television broadcast of the film" (464 U.S. at 454, fn. 39 quoting 480 F.Supp. at 467) and a "live viewer is no more likely to buy prerecorded videotapes [another market that could be supplanted] than is the time-shifter" (464 U.S. at 450, fn. 33).

We find the court's observations even more compelling in the situation presented and especially question whether the intended use of videocassette technology could materially harm the copyright owners.  More than is the case with the general public, the limited time-shifted exhibition of a work in a Youth Authority institution is not likely to have a serious adverse impact on the potential markets for it.  To begin with, as there, a copyright holder will benefit when his work is shown from an earlier recorded television program since more people will be able to view it than would otherwise have had the chance.  (Sony at 453 fn. 38 quoting 480 F.Supp. at 466; cf. Sony at 450 fn. 33, 452 fn. 35, 452 fn. 36, 453 fn. 37 quoting 480 F.Supp. at 466, 467, 468.)  But then we must remember that unlike the situation with the general public, the viewing audience in a Youth Authority facility will not be composed of persons who are likely to be customers in other markets for the work--by choosing to see it in a theater or by buying a prerecorded version of it instead.  In fact the wards, and to some extent the employees, cannot even choose their own viewing schedule for a live broadcast.  In short, the viewing audience is not likely be a viable potential source of further revenue for the copyright owner which would be supplanted by their seeing a time-shifted version of a work.  To the contrary as just mentioned, their being able to view it in such a manner would enhance the profits of his television market beyond what they would have otherwise been without their so doing, and with respect to the other markets, it is possible that profits in them would increase as well if the wards make efforts upon their release to see a film in a theater or buy a cassette version of it for themselves.  (Cf. 464 U.S. at 454, fn. 39; 480 F.Supp. at 467.)

We therefore do not believe that the exhibition of copyrighted works in a Youth Authority facility via time-shifting  will affect the copyright owners' other markets for them, and accordingly we conclude that factor four favors a finding of "fair use" with respect to that activity.

In Sony the high court observed that,

"One may search the Copyright Act in vain for any sign that the elected representatives of the millions of people who watch television every day have made it unlawful to copy a program for later viewing at home, or have enacted a flat

14.                    86-801

prohibition against the sale of machines that make such copying possible." (464 U.S. at 456.)

In that case they agreed with the District Court that such "time-shifting" was a "fair use" of the copyrighted work and not an infringing one. (Id. at 442, 456.) We deal with time-shifting in a custodial setting where time-shifting of freely broadcast television programs can yield unique benefits to the institutionalized population and conclude the same with respect to that activity. Weighing it in the four-factor calculus of section 107, we find that the purpose and character of the use, the nature of the copyrighted work, and the lack of ensuing harm to the owners' potential markets, make the contemplated use of their works a "fair" one, and accordingly we conclude that the showing of such copyrighted works recordings Authority personnel had themselves made from earlier regular television broadcasts would not amount to an infringement of copyright.

> Question No. 2: Institutional Showing
> of Store-bought or Rented Cassettes

We find the "fair use" calculus to produce a different result with the showing of copyrighted works from videocassettes that the Authority would rent or purchase at normal price. Question number 2 asks whether the showing of such store-bought or rented videocassettes of copyrighted motion pictures to the institutionalized Youth Authority wards via a videorecorder and a television monitor in their day rooms, constitutes a copyright infringement. As mentioned, in 1982 we were asked the same question with respect to showings of those videocassettes to inmates in California correctional institutions and concluded that it would constitute an infringement because the showings were public performances of the copyrighted works and not a "fair use" of them. (65 Ops.Cal.Atty.Gen. 106, 107-108, 110, 117.) [We also examined the exceptions provided in the Act for specific non-infringements (§§ 108-118) and concluded that none of them applied (65 Ops.Cal.Atty.Gen. at pp. 117-119).] Also as mentioned, our "fair use" analysis of the question was predicated on that of the Ninth Circuit in the Sony litigation which was subsequently discredited and rejected by the Supreme Court (see fn. 9, ante & accompanying text) and thus we are essentially called upon to reevaluate the "fair use" aspect of our former opinion.

It may appear incongruous to say that when one rents, or certainly when one buys, a prerecorded videocassette at a store, that one cannot use it as one would. But that is the case, for the fact that a videocassette of a copyrighted work is bought at or rented from a retail outlet does not mean that the renter or purchaser is automatically free to later publicly perform it without authorization from the copyright holder. The rights protected by copyright are divisible and the waiver of one by the copyright owner (such as the right to distribute the work or to copy it) does not necessarily waive any of his other rights in its regard (such as authorizing public performances of it). (§ 202; Columbia Pictures Industries, Inc. v. AVECO, Inc., supra, 800 F.2d at 64 citing Columbia Pictures Industries v. Redd Horne, supra, 749 F.2d at 160; United States v. Powell (8th Cir. 1983) 701 F.2d 70, 72; United States v. Moore (9th Cir. 1979) 604 F.2d 1228, 1232.) As we explained in 65 Ops.Cal.Atty.Gen. 106, supra, at 117, a dual source and two-tiered pricing system exists for the sale or rental of such cassettes, reflecting the contemplated performance by the user. For a price, institutional users can obtain cassettes together with rights of unrestricted (public or

even commercial) performance from an authorized distributor; individuals can obtain the same work from a retail outlet for perhaps one fifth the price, but there only private use is authorized and that restriction is made clear by notation on the cassette. The purchaser of such cassettes is thus put on notice that the copyright holder has not authorized public performances of his work contained thereon, and an unauthorized use, such as a public performance, violates his exclusive right under section 106(4), unless, again, it constitutes a "fair use" under section 107.

We have determined in answer to the first question here that the showing of Authority-recorded videocassettes to the wards at the Authority's institutions would constitute public performances of the recorded copyrighted works within the meaning of the protection offered by section 106, clause (4) of the Copyright Act. The same would be true of showings of prerecorded store-bought or rented cassettes, and showing them in the circumstances would constitute an infringement of the owner's copyright unless it constitutes a fair use of the material. Question two thus resolves to reexamining the activity in light of the "fair use" calculus of section 107. The factors for analysis are of course the same as in question one--(1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount of the "taking"; and (4) the issue of harm--but the resolution of the issue upon them is different.

The determination of what constitutes fair use involves a balancing of all the equities in each case, and while Congress has offered four factors which should be considered in so doing, it has not provided a rigid formula or decided the weight to be given to any particular factor. "Indeed, since the doctrine [of fair use] is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts." (H.Rept., supra, at 650.) Nevertheless the factors given in section 107 were meant to provide some gauge for balancing the equities between the interest of the copyright owner and the public generally in deciding whether a particular use is fair (cf., ibid.; 65 Ops.Cal.Atty.Gen., supra, at 111), and since every application of them is sui generis, any change in assessing the factors can mean a change in the overall result. (Cf. Meeropol v. Nizer, supra, 560 F.2d at 1068.) We believe that happens here with the second question where a change in factors 2 and 4 affect the result of the fair use equation.

As with the showing of time-shifted programs, the purpose and character of the use (factor No. 1) still can favor a finding a "fair use" with respect to the store-bought or rented videocassette. The use is noncommercial--which favors such a finding (Sony at 449), and even though the purpose may be to entertain, we now know that is not necessarily fatal to the finding being made (id. at 445). Then, as with the time-shifting of television programs, the showing of pre-recorded store-bought or rented videocassettes, even if only to entertain, can also contribute to the psychological well-being of the wards, a character of use which also favors a finding of "fair use". (Sony at 445, fn. 40.) Also as before, such showings can bring unique benefits of a positive social value with respect to the wards' education, rehabilitation and ultimate socialization as productive members of society. (Cf. 65 Ops.Cal.Atty.Gen. at 114, fn. 10.) Overall, the purpose and character of the showing of videocassettes is such as to favor a finding that it constitutes a fair use of the material.

But with the second question, factor number 2 (the nature of the copyrighted work) has changed. We no longer have the use of a work from a freely distributed medium where there is no direct economic relationship between the copyright owner and the ultimate user (cf., Teleprompter Corp. v. CBS, supra, 415 U.S. at 411-412), but rather one which embodies a direct economic relationship which, as we shall soon see in connection with a discussion of factor 4, stands to be adversely affected by unauthorized use. The works involved are copyrighted motion pictures or other audiovisual dramatic works that have been reduced to videocassette. It is noteworthy that the Copyright Act treats those works with special solicitude, reflecting no doubt, the relatively large economic investment involved in their creation. (65 Ops.Cal.Atty.Gen., supra, at 115.) Although we have characterized a purpose for their creation as being one of social commentary or education, and although we have said that as used the materials can serve important public purposes, still we cannot escape the fact that the works were primarily created for entertainment purposes and that they have specifically been placed on the videocassette medium to exploit the economic potential of their copyright in that regard. Even though the medium in many cases may be but a "secondary" market for the copyright holder's exploitation of his work, following its presentation in the theater, still the market which the medium represents has very real economic potential for him which is deserving of copyright protection. (Id. at 116.) In that regard it is also noteworthy that the legislative history of the Copyright Act shows that even with the favored position given uses of educational broadcasts and classroom reproduction, Congress expected that the availability of the fair use doctrine would be narrowly circumscribed and applied strictly in the case of motion pictures and other audiovisual works. (H.Rept., supra, at p. 65; S.Rept., supra, at pp. 64, 72.) In short, the different medium of presentation alters the perception of the nature of the work as it is used, and we find that with respect to the store-bought or rented videocassette, factor 2 goes against a finding of fair use.

So would factor number 3, the substantiality of the taking. Before, with "time-shifting" of freely broadcast television works, we could pass off the fact that a whole work was being taken; "consider[ing] the nature of a television copyrighted audiovisual work and that time-shifting merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge, the fact that the entire work is reproduced . . . [did] not have its ordinary effect of militating against a finding of fair use." (Sony, supra, at 449-450.) But that is not so here. We have just shown how the nature of a work presented on the videocassette medium is not the same as its presentation on television and factor 3 can no longer be ignored. We find that it does not favor a finding of fair use.

Factor number 4, the issue of harm, clearly militates against it, for now with the film or videocassette rental or sales there is a market for the work which stands to be harmed by their projected use. Also there is now a direct economic relationship between the copyright holder and the user, wrought in the purchase, and harm from an infringing use is not speculative, as it was before.

As with time-shifting from the television medium, two markets for the copyright holder's exploitation of his works will not be supplanted by the wards being shown store-bought or rented videocassettes of them for the wards are not in a position to choose to see them in the theaters or to buy their own cassette versions of them. However, unlike the situation with television time-

shifting, which was shown in the Sony litigation not to have an adverse economic impact on any market, a market for a copyright holder's works does exist which can be affected: the higher price that can be charged for institutional showings of them. As mentioned, a two-tiered pricing system exists for the sale or rental of videocassettes reflecting the contemplated performance by the user; one in which the copyright holder authorizes only private showings of his work by their sale or rental and a more expensive one in which the sale or rental carries the right to perform the work publicly. (See also, 65 Ops.Cal.Atty.Gen., supra, at 117.) When one buys or rents a cassette from a regular retail outlet, the cassette contains a notation that its use is restricted to private viewing, but for a higher price institutional users can obtain cassettes together with the right of unrestricted public performance from an authorized distributor. (Ibid.) We also understand that copyright holders make movies and other audiovisual works available to institutional users in the 16 millimeter film format. Needless to say both of these media designed for the institutional exploitation of copyrighted works can be supplanted if they can be obtained and shown by institutions from a store- bought or rented videocassette much less expensively. (Cf. Encyclopaedia Brittanica Ed. Corp. v. Crooks (W.D.N.Y. 1982) 542 F.Supp. 1156, 1169-1170.)

Thus although a copyright holder may profit from the sale of a videocassette of his work to an institution such as the Youth Authority, the profit will not be as great as it would be if the institution bought or rented the work on the market(s) designed for institutional showings, and "[n]eedless to say, using cassettes purchased on the normal retail market, where only private use is authorized, for other purposes such as institutional showings without paying the premium therefor, would completely destroy the economic potential of the special market created by the copyright owner for them. (Ibid.) The use will therefore lessen the value of the copyrighted work in a particular market, interfere with its particularized marketability, and prejudice that aspect of its potential sale. "Inasmuch as the Copyrights Act protects a copyright owner's exploitation of that market from [such] potential harm, we find that the fourth factor weighs against a finding of fair use." (Ibid.). As mentioned, this fourth factor, resultant harm, has been described as "undoubtedly the single most important element of fair use." (Harper & Row v. Nation Enterprises, supra, 471 U.S. at 566.)

With the showing of store-bought or rented videocassettes of copyrighted motion pictures to Youth Authority wards, only one factor of the fair use calculus, the first, supports a finding of "fair use", and even there the purpose and character of the use, primarily entertainment, is not the strongest justification for unauthorized use. In its regard it is true that there are public purposes to be served by such showings of videocassettes to the wards, but when those positive purposes are weighed in the balance with the other factors of fair use analysis, which we have shown do not favor a finding of fair use in this instance, the overall consideration leads to a conclusion that the showing of the cassettes would not be a "fair use" of the copyrighted works involved. Accordingly in answer to the second question, we conclude that the showing of store-bought or rented videocassettes of copyrighted motion pictures to wards in Youth Authority facilities would constitute a copyright infringement.

The Communications Act of 1934 As Amended By The Cable Communications Policy Act of 1984:

The third question we are asked is whether the Youth Authority may use a satellite dish to enable its employees and wards to receive regularly broadcast free television programs.  The need for such is occasioned by the lack of reception with a standard antenna at some of the Authority's facilities because of their location.

Section 705 (formerly § 605) of the Communications Act of 1934 generally prohibits anyone who is not authorized by the sender from intercepting any "radio communication" and divulging it to another, or from using it for his or her own benefit or the benefit of others not entitled thereto.  (See Appendix.)  The term "radio communication" is defined by section 3(b) of the Act, 47 U.S.C.A. section 153(b), as "the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds . . . ." and this has been construed to include television transmissions.  (California Satellite Systems v. Seimon (9th Cir. 1985) 767 F.2d 1364, 1366; ON/TV of Chicago & Julien, supra, 644 F.2d 820, 821, fn. 1; Allen B. Dumont Laboratories v. Carroll (3rd Cir. 1950) 184 F.2d 153, 155, cert. den. 340 U.S. 929 (1951).)  Regarding them, the section not only prohibits the unauthorized interception of traditional television transmissions, but also those utilizing new technologies such as the unauthorized reception of subscription television (STV), multipoint distribution services (MDS) and satellite communications.  (California Satellite Systems v. Seimon, supra, at 1365, 1366, 1367; ON/TV of Chicago v. Julien, supra, at 840, 843; Movie Systems, Inc. v. Heller (8th Cir. 1983) 710 F.2d 492, 493-495; National Subscription Television v. S & H TV, supra, 644 F.2d 820, 821-825; Chartwell Communications Group v. Westbrook (6th Cir. 1980) 637 F.2d 459, 460, 465; Quincy Cablesystems v. Sully's Bar (D.Mass. 1986) 640 F.Supp. 1159, 1161; see also Legis. Hist. P.L. 98-549, 1984 U.S. Cong. & Admin. News at p. 4746; cf. id. 4658-4659.)

Section 705 contains two exceptions to its proscription, however.  The first, found in subsection (a) [former § 605 itself] provides that the section does not apply, inter alia, to receiving or utilizing contents of any communication "which is transmitted by any station for the use of the general public."  The second, added by the Cable Communications Policy Act of 1984, Public Law 98-549, provides a very limited exception for the interception of unencrypted (unscrambled) satellite cable programming for private viewing where a marketing system for it is not established.  (See § 705, subsecs. (b), (c); fn. 11, ante.)  The first exception applies to the situation described herein; the second is not germane.  (See fn. 12, post.)

As noted at the very outset of this opinion, we are told that the Youth Authority is only interested in using a satellite dish as a "super antenna" to receive regularly broadcast commercial television programs that it could not otherwise receive with a standard antenna because of the remote locations of its facilities.  (See fn. 1 & accompanying text.)  It is not interested in and has no intention of using the device to "pirate" signals which a subscription cable service broadcasts for subscribers to receive for a fee.[10]  The former type of broadcasting comes within the first and

---

[10]The second exemption from section 705, that found in its subsections (b) and (c)--for an individual to intercept unencrypted satellite cable programming for private viewing where a marketing system is not established for it, is therefore not germane.  The exemption deals with

pertinent exception to section 705 for receiving and utilizing the contents of communications that are "broadcast for use by the general public" (id., subsec. (a)); the latter does not. (California Satellite Systems v. Seimon, supra, 767 F.2d at 1365-1368 & 1366 fn. 1; ON/TV of Chicago v. Julien, supra, 763 F.2d at 842-843; National Subscription Television v. S & H TV, supra, 644 F.2d at 824-825; Chartwell Communications Group v. Westbrook, supra, 637 F.2d at 465-466; Movie Systems, Inc. v. Heller, supra, 710 F.2d at 494-495; Quincy Cablesystems v. Sully's Bar, supra, 640 F.Supp. at 1160-1161.)

"Courts have held that for the purposes of section 605, the crucial factor in determining whether the programming is broadcasting for the use of the general public is not whether the content of the program has mass appeal or mass availability but rather, whether it was intended for the use of the general public. [Citations.]" (Movie Systems, Inc. v. Heller, supra, at 494; accord, ON/TV of Chicago v. Julien, supra, 763 F.2d at 842.) Such would be true of the broadcasts the Youth Authority proposes to receive with its satellite dishes: They are broadcasts which are transmitted by their senders with an intention that they be received, i.e., "used", by the general public without payment of any fee for them. (Compare, Sony, 464 U.S. at 449 [a work which (a viewer) has been invited to witness in its entirety free of charge] with Quincy Cablesystems v. Sully's Bar, supra, at 1161 [use of satellite dish to intercept program signals intended for paying customers only].) No connection exists between the broadcaster and the viewer other than the broadcast itself (cf. Teleprompter Corp. v. CBS, supra, 415 U.S. 394, 411-412), and the broadcaster "has no control over the segment of the population which may view the program." (Id. at 412.) Thus, rather than be concerned with a "right to control the reception of its communications" (Quincy Cablesystems v. Sully's Bar, supra, 640 F.Supp. at 1161) or "control public viewing" (National Subscription Television v. S & H TV, supra, 644 F.2d at 825), a commercial broadcaster's interest is with its transmission. Concern regarding reception of a program is not with control but with the hope that it will be freely received by as many members of the public as possible so as to increase its ratings and thus attract revenues. (Teleprompter Corp. v. CBS, supra, at 411-413; Universal City Studios v. Sony Corp. of Amer., supra, 480 F.Supp. at 453, 466.)

The proposed use of satellite dishes by the Youth Authority does not contravene that expectation. Indeed, as we have shown in answering the first question, it in fact promotes it, a fact which distinguishes the use from the uses of "special equipment" to receive programs that could not otherwise be received that courts have said violate section 705. (See, e.g., Movie Systems, Inc. v. Heller, supra, at 493 (microwave antenna and down converter); National Subscription Television v. S & H TV, supra, at 821, 824 (decoder); California Satellite Systems v. Seimon, supra, at 1365, (special antenna for high frequency signal, down converter, and special power supply); Chartwell Communications Group v. Westbrook, supra, at 465 (special equipment, encoder and decoder),

---

the limited problem of interception piracy of subscription satellite programs with satellite dishes. (47 U.S.C.A., § 605(c)(1) [satellite cable programming][fn. 11 ante]; cf. id., § 522, subsecs. (4) [cable operator], (5) [cable service], (6) [cable system]--all defined in terms of subscription; see also Legis. Hist. P.L. 98-549, Statement of Senator R. Packwood, Chairman of the Committee on Commerce, Science and Technology, 1984 U.S. Cong. & Admin. News at p. 4748-4749.)

Quincy Cablesystems v. Sully's Bar, supra, at 1161 (satellite dishes).)  Unlike them the proposed equipment here will be installed not to breach a system and avoid paying its fee, but to enable the Authority to receive programs from a system which intends that they be freely received by the Authority along with as many other members of the general public as is possible.

The provisions of section 705 of the Communications Act of 1934 were aimed, inter alia, at prohibiting the unauthorized use of broadcast signals.  (California Satellite Systems, supra, 767 F.2d at 1366, citing Home Box Office v. Advanced Consumer Technology, etc. (S.D.N.Y. 1981) 549 F.Supp. 14, 18-19, which traced the legislative history of former section 605 back to the Radio Act of 1927).)  Thus, section 705 provides that "no person not being authorized by the sender shall intercept any . . . communication and divulge or publish [its] . . . contents . . ." and it accords a sender the right to bring an action to restrain a violation and receive damages.  (Id., subsec. (d)(3); see ON/TV of Chicago v. Julien, supra, 763 F.2d at 842; National Subscription Television v. S & H TV, supra, 644 F.2d at 821, fn. 1; California Satellite Systems v. Seimon, supra, 767 F.2d at 1366, fn. 1; Quincy Cablesystems v. Sully's Bar, supra, at 1161.)  Against that, the exemption of subsection (a)--of general public broadcasting--makes sense:  when transmissions are intended for general public reception, authorization for their receipt does not come into play, and it is meaningless to think in terms of one receiving such broadcasts as receiving something which he or she is not "authorized to receive." (Compare California Satellite Systems v. Seimon, supra, at 1367.)  Thus, whether viewed against the basic proscription of subsection (a) or its exemption, the Youth Authority's proposed action does not come within the ambit of section 705.

Accordingly we conclude that the Youth Authority may use a satellite dish to enable its employees and wards to receive regularly broadcast television programs.

* * * * *

APPENDIX

The Communication Act of 1934 (48 Stat. 1103) is classified to title 47 of the United States Code. Section 705 received its current designation when former section 605 was renumbered and amended by the Cable Communications Policy Act of 1984, Public Law 98-549, sections 5(a), 6(a), 98 Stat. 2802, 2804. It reads as follows:

"(a) [Practices prohibited]

"Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is transmitted by any station for the use of the general public, which relates to ships, aircraft, vehicles, or persons in distress, or which is transmitted by an amateur radio station operator or by a citizens band radio operator.

"(b) [Exceptions]

"The provisions of subsection (a) of this section shall not apply to the interception or receipt by any individual, or the assisting (including the manufacture or sale) of such interception or receipt, of any satellite cable programming for private viewing if--

"(1) the programming involved is not encrypted; and

"(2)(A) a marketing system is not established under which--

"(i) an agent or agents have been lawfully designated for the purpose of authorizing private viewing by individuals, and

"(ii) such authorization is available to the individual involved from the appropriate agent or agents; or

"(B) a marketing system described in subparagraph (A) is established and the individuals receiving such programming has [sic] obtained authorization for private viewing under that system.

"(c) [Definitions]

"For purposes of this section--

"(1) the term "satellite cable programming" means video programming which is transmitted via satellite and which is primarily intended for the direct receipt by cable operators for their retransmission to cable subscribers;

". . . . . . . . . . . . . . . . . . . . . . . .

"(d) [Penalties; civil actions; remedies; attorney's fees and costs; computation of damages; regulation by State and local authorities]

". . . . . . . . . . . . . . . . . . . . . . . .

"(e) [Rights, obligations and liabilities under other laws unaffected]

"Nothing in this section shall affect any right, obligation, or liability under Title 17 [the federal Copyright Act], any rule, regulation, or order thereunder, or any other applicable Federal, State or local law."  (Emphases added.)

The 1984 amendment redesignated the existing provisions of former section 605 without change as new section 705, subsection (a) and added subsections (b) through (e) to it.  (P.L. 98-549, supra.) Section 705 is classified to title 47 United States Code Annotated section 605, while the main body of the Cable Communications Policy Act of 1984, the addition of the new title VI to the

Communications Act of 1934 consisting of sections 601 through 639 (by P.L. 98-549, § 2), is classified to title 47 United States Code Annotated sections 521-559.